**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Rita Carpenter GREEN and Richard William Payne, Defendants-Appellants.**

**No. 73-1210.**

United States Court of Appeals,
Fifth Circuit.

May 23, 1974.

Rehearing and Rehearing En Banc
Denied July 16, 1974.

L. Lynn Elliott, Dallas, Tex. (Court-appointed), for defendants-appellants.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Charles D. Cabaniss, Roger J. Allen, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, and AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

Appellants Richard William Payne and Rita Carpenter Green were each convicted on nine counts of violation of the federal mail fraud statute, 18 U.S.C. § 1341, for devising a scheme to defraud through the unlawful use of credit cards. They were each sentenced to five years' imprisonment on each of the first two counts, these terms to run consecutively. Sentences on the remaining counts were suspended, and appellants were placed on probation for five years, to run consecutively to the sentences imposed.[1] On appeal, they raise issues concerning the scope of the mail fraud statute and the sufficiency of the evidence, as well as other assorted contentions. We affirm in part and reverse in part.

The relevant portions of the mail fraud statute provide:[2]

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1341.

1. The sentences of appellant Payne are to run consecutively to a three-year sentence he is presently serving for another conviction.

2. The full text of the section reads:
§ 1341. Frauds and swindles
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The first six counts of the indictment under which appellants were convicted contained these common allegations: (1) on or about October 1, 1970, and continuing until mid-1972, appellants "devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises"; (2) as part of such scheme and artifice, appellants "would apply for and obtain credit cards from businesses they intended to defraud, among such businesses would be Texas Bank and Trust Company of Dallas, BankAmericard Center, Diners Club, American Express Company, Mobil Oil Corporation, Gulf Oil Corporation, Texaco, Inc., Humble Oil and Refining Company and Shell Oil Company"; (3) "[i]n submitting credit card applications to such businesses, [appellants] would willfully make false and misleading representations in order to make it appear that they were worthy of credit and to induce the businesses to be defrauded to issue credit cards to them"; (4) the credit cards so obtained would be used by appellants "to purchase large quantities of merchandise and many services from business establishments . . . when in fact they intended not to pay for such purchases"; (5) "[u]pon receipt of bills and statements of account for their purchases . . . [appellants] would willfully refuse and fail to pay . . ."; and (6) "for the purpose of executing such scheme and artifice and attempting to do so, did . . . knowingly cause to be placed in an authorized depository for mail matter, a business reply envelope to be sent and delivered by the Post Office Department according to the direction thereon . . . ." Each of the first six counts alleges the mailing of a different business reply envelope, constituting an application for a credit card, to an issuing company.

Counts 7, 8 and 9 of the indictment each allege that appellants, for the purpose of executing their scheme to defraud, knowingly caused the mailing of an invoice subsequent to the receipt by them of goods and services.

Evidence presented at the trial showed that between October 1970 and May 1972, appellants, through the use of twenty-one credit cards and four different surnames, incurred total charges of $135,432, for which they did not pay.[3] Here, we outline briefly the evidence pertaining directly to each count of the indictment.

■ Count 1 dealt with a BankAmericard application, which was identified at trial as having been received through the mail. This application, in the name of Richard W. Payne, with Rita K. Payne listed as his wife, requested that two cards be issued. Testimony revealed that a previously issued BankAmericard had been seized from appellant Green by a retail merchant prior to this application. The mailing of another BankAmericard application in the name of Richard Kenner, also requesting two cards, formed the basis of proof on count 5 of the indictment. This application listed Kenner's wife's name as Rita Kay. These two applications and a third were all rejected by BankAmericard because officials were able to identify all three applicants as Richard W. Payne, the holder of a BankAmericard account with a substantial unpaid balance.[4] The Government's handwriting expert identified appellant

3. In all, appellants applied for twenty-seven cards. Five of these applications were refused, and one credit card was not used. See note 4 infra.

4. The criminal activity for which appellants were convicted occurred when they used the mails to submit the applications in attempting to secure credit cards for use in their fraudulent scheme to obtain goods and services without intending to pay for them. There is, therefore, no legal significance in this case to the fact that no credit cards were issued to appellants after they submitted the applications treated in counts 1 and 5 of the indictment or to the fact that the card received on the basis of the application named in count 6 was not used.

Payne as the writer of the applications named in counts 1 and 5.

Count 2 of the indictment dealt with a Gulf Oil Company credit card application that was sent through the mails. The Government's witness testified that pursuant to this application, which listed the applicant's spouse as Rita K., a card was issued in the name of Richard Kenner. The handwriting of Kenner on the application was identified as that of appellant Payne. An associate of appellants further testified that he saw appellants make certain charges on the card in February 1972.

Count 3 of the indictment charged mail fraud involving an application received through the mail for a Mobil Oil Company credit card. A card was issued in the name of Richard Kenner as a result of the application, and the handwriting on an invoice resulting from the use of the card was identified as that of appellant Payne. Count 6 also involved a Mobil credit card application, this time in the name of Richard W. Green. As a result of this application, which was received through the mail, a Mobil credit card was mailed to an address at which, it was shown, appellants resided at the time. *See* note 4 *supra*. An additional Mobil credit card was applied for in the name of Richard W. Traylor. At trial, it was stipulated that appellant Payne had, from time to time during the previous two years, submitted applications for credit cards in the name of Richard Traylor.

Count 4 concerned the sending through the mail of a Shell Oil Company credit card application, which requested issuance of two cards and which was completed in the name of Richard Kenner. His wife's name was listed as Rita. The application, which resulted in the issuance of the Shell cards, bore handwriting identified as that of appellant Payne. This Shell card was used during December 1971 to purchase eighty-four new automobile tires at several different service stations. Government witnesses identified both appellants as the persons who had purchased the tires.

The remaining counts of the indictment, 7, 8 and 9, charged that, as part of the scheme to defraud, the mails had been used in the transmission of invoices between various service station dealers, who supplied automobile tires to appellants, and Humble Oil Company, which had extended credit on the basis of the credit cards issued to appellants. The testimony on these three counts showed that on certain occasions persons identified as appellants used a Humble credit card issued in the name of Richard Kenner to purchase the tires. The testimony further showed that the particular invoices for the sale of the tires were sent by the dealers, who were located in the Fort Worth, Texas, area, through the mail to the Humble Credit Card Center in Houston, Texas.

The purpose of the mail fraud statute, section 1341, is "to prevent the post office from being used to carry [schemes to defraud] into effect . . . ." Durland v. United States, 161 U.S. 306, 314, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896); *see* Parr v. United States, 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960). The two basic elements of a mail fraud offense are (1) the scheme to defraud, and (2) causing a mailing for the purpose of executing the scheme. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *see* United States v. Bruce, 5 Cir., 1973, 488 F.2d 1224, 1230; Bass v. United States, 5 Cir., 1969, 409 F.2d 179, cert. denied, 396 U.S. 863, 90 S.Ct. 138, 24 L.Ed.2d 117. While the mailing must, as the statute requires, be "for the purpose of executing the scheme," Kann v. United States, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944), "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element. United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548," Pereira v. United States, *supra*, at 8, 74 S.Ct. at 362; *see*

United States v. Maze, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). Indeed, it is sufficient if the mailing that is caused is "a part of the execution of the fraud," Kann v. United States, *supra*, at 95, 65 S.Ct. at 151, or is "incident to an essential part of the scheme," Pereira v. United States, *supra*, at 8, 74 S.Ct. at 363; *see* Parr v. United States, *supra*, at 390, 80 S.Ct. at 1183. One "causes" the mails to be used when one "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . . United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836." Pereira v. United States, *supra*, at 8, 74 S.Ct. at 363; *see* United States v. Maze, *supra*, at 399, 94 S.Ct. at 648. The things caused to be mailed may be "innocent in themselves" without effecting immunization from the mail fraud statute, as long as the mailing is " 'a step in a plot.' Badders v. United States, 240 U.S. [391, 394], 36 S.Ct. [367], 368 [60 L.Ed. 706]." Parr v. United States, *supra*, at 390, 80 S.Ct. at 1183. Intent, in other words, "may make an otherwise innocent act criminal, if it is a step in a plot." Badders v. United States, 240 U.S. 391, 394, 36 S. Ct. 367, 368, 60 L.Ed. 706 (1916). *But see* note 13 *infra*.

Appellants' major contention is that each of the nine counts of the indictment does not properly and legally charge a mail fraud offense under section 1341. They base their contention on two alternative propositions: first, that the Supreme Court's recent decision in United States v. Maze, *supra*, precludes as a matter of law the prosecution of appellants under any of the nine counts of the indictment; and second, that 15 U.S.C. § 1644 of the Truth in Lending Act, is the exclusive vehicle for the prosecution of the fraudulent use of credit cards involving more than $5,000.

In United States v. Maze, *supra*, Maze was indicted on four counts of violation of section 1341 for knowingly causing the mails to be used in connection with a scheme to defraud through unlawfully obtaining possession of a credit card issued by a Louisville, Kentucky, bank and using the card to obtain goods and services from merchants—specifically, food and lodging at motels—in three states. The indictment alleged that Maze knew that each merchant would cause sales slips for the purchases to be delivered by mail to the Louisville bank, which would, in turn, mail them to the true owner of the card for payment. No allegation was made as to the use of the mails prior to Maze's receipt in each instance of goods and services on the four separate occasions on which the Government showed he had used the card. The indictment did, however, allege that the delay inherent in the mailings subsequent to each purchase would enable Maze to continue purchasing goods and services for an appreciable period of time.

The Supreme Court held section 1341 inapplicable to Maze's conduct because the mailings were not "for the purpose of executing" the scheme involved. The mailings, the Court said, were directed toward the settling of accounts among the victims of Maze's scheme, the motel proprietors, the Louisville bank, and the true owner of the card; and the success of his plan depended in no way on which of the victims ultimately bore the loss. United States v. Maze, *supra*, at 402, 94 S.Ct. at 649. The Government's contention that the delay caused by use of the mails was essential to the continuation of the fraudulent credit card scheme was rejected, the Court pointing out that the distance, not the mail service, was responsible for the time lag in physical transmission of the invoices. *Id.* at 649–650.[5]

■ The *Maze* decision, as the Government concedes, requires reversal of

---

5. In *Maze*, the Supreme Court noted four prior decisions of this Court that took a view contrary to the Sixth Circuit's *Maze*

decision, which the Supreme Court affirmed: Adams v. United States, 5 Cir., 1963, 312 F.2d 137; Kloian v. United States, 5 Cir.,

appellants' convictions on counts 7, 8 and 9. Like the indictment in *Maze*, those counts charge use of the mails in the transmission of invoices between the retail merchants who supplied goods and services to appellants and the company that issued the card and extended the credit. Just as *Maze's* "scheme reached fruition when he checked out of the motel . . . " *id.* at 649, appellants' plan to defraud reached an endpoint in each instance named in counts 7, 8 and 9 when appellants left the service stations after purchasing automobile tires with the Humble credit card. Appellants had received the automobile tires, and "[i]t was immaterial to them, or to any consummation of the scheme, how [the victims arranged their accounts]." Kann v. United States, 323 U.S. 88, 94, 65 S. Ct. 148, 151, 89 L.Ed. 88 (1944); *see* United States v. Owen, 5 Cir., 1974, 492 F.2d 1100.

Though *Maze* necessitates reversal of the last three counts, it does not invalidate the convictions under counts 1 through 6. *Maze* does not, as appellants contend, stand for the broad proposition that credit card frauds can never be among those frauds proscribed by section 1341.[6] As the Court noted in *Maze*, "[t]he mail fraud statute, first enacted in 1872, 17 Stat. 323, c. 335, § 301, while obviously not directed at credit card frauds as such, is sufficiently general in its language to include them if the requirements of the statute are otherwise met." United States v. Maze, *supra,* at n. 4, 94 S.Ct. at 648 n. 4. The mailings of applications to secure credit cards from issuers, as identified in counts 1 through 6, are enough to bring the schemes described in those counts within the requirements of the mail fraud statute. The uses of the mails to secure credit cards were "for the purpose of executing" the scheme to defraud through which appellants purchased goods and services without paying for them.[7]

The significance of mailing the applications for the credit cards is amplified in this case by two factors. First, with respect to counts 2, 3, 4 and 6, the distance from appellants' residence in Dallas to the offices issuing the credit cards dictated the use of the mails for delivering the applications to the companies. In three of the counts, the issuing offices of the companies from whom appellants sought credit cards were located outside of Texas: in Missouri (counts 3 and 6), and in Oklahoma (count 4). Another issuing office was located in a different city, Houston (count 2). Second, this is a case in which the mails served as "a means of concealment so that further frauds which are part of the scheme may be perpetrated." Kann

1965, 349 F.2d 291, cert. denied, 384 U.S. 913, 86 S.Ct. 1349, 16 L.Ed.2d 365 (1966); United States v. Reynolds, 5 Cir., 1970, 421 F.2d 178; United States v. Thomas, 5 Cir., 1970, 429 F.2d 407. For cases decided in this circuit since *Maze, see, e. g.,* United States v. Owen, 5 Cir., 1974, 492 F.2d 1100; United States v. Gardner, 5 Cir., 1974, 490 F.2d 840.

6. *See also* United States v. Kelem, 9 Cir., 1969, 416 F.2d 346, 350, cert. denied, 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970):

[T]he propriety of convictions . . . under section 1341, does not turn upon a mechanical determination of when the mailings occurred; rather, the determination depends upon a careful examination of the evidence in each case to determine the contribution made by mailings to the scheme's success.

7. We think that the Supreme Court's comments in United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), concerning the effects of two of the Court's major opinions on the mail fraud statute are equally applicable to the holding in *Maze*:

We are unable to find anything in either the Kann or Parr case which suggests that the Court was laying down an automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be "for the purpose of executing" the defendants' scheme. Rather the Court found only that under the facts in those cases the schemes had been fully executed before the mails were used.

317 U.S. at 80, 83 S.Ct. at 176.

v. United States, 323 U.S. 88, 94–95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944); see United States v. Maze, —— U.S. ——, —— ——, 94 S.Ct. 645, 655, 38 L.Ed.2d 603 (1974) (White, J., dissenting), and cases cited therein. Appellants' use of the mails to deliver credit card applications aided them in obtaining cards from the same issuer under different names. For example, with respect to the only local issuer from whom appellants sought cards dealt with in the counts not mentioned above, counts 1 and 5, appellant Payne applied for BankAmericards under two different names: in count 1 as Richard W. Payne and in count 5 as Richard Kenner. Had appellant Payne, using two different names, sought these cards in person, rather than by mail, presumably it would have been more easily detected that Payne and Kenner were one and the same applicant. Concealment was also an important factor with respect to counts 2, 3, 4 and 6 of the indictment, in which the distances involved had otherwise necessitated the use of the mails; for use of the mails, as opposed to in-person delivery, would hinder an issuer's realization that it had already issued a credit card under a different name to the same applicant and that there were unpaid charges outstanding on each of the earlier issued cards.

In sum, since appellants' fraudulent credit card scheme began with the securing of the cards by mail, the use of the mails "played a significant part in enabling [appellants] . . . to acquire dominion over . . . " more than $135,000 in goods and services for which they did not pay. United States v. Maze, supra, at ——, 94 S.Ct. at 649; see Pereira v. United States, 347 U.S. 1, 5, 8–9, 74 S.Ct. 358, 361–363, 98 L.Ed. 435 (1954). These mailings were indispensable, for they were "incident to an essential part of the scheme," Pereira v. United States, supra, at 8, 74 S.Ct. at 363; see Parr v. United States, 363 U.S. 370, 390, 80 S.Ct. 1171, 1183, 4 L.Ed.2d 1277 (1960)—obtaining the credit cards in the first instance.

■ Appellants also argue that the indictment is legally insufficient because section 1644 of the Truth in Lending Act is the exclusive vehicle for the prosecution of fraudulent credit card schemes such as theirs. Section 1644, a 1970 amendment to the Act, provides criminal penalties for the unauthorized use of a credit card in a transaction "affecting interstate commerce" and involving goods or services exceeding $5,000 in value.[8] Appellants apparently suggest that in passing the amendment Congress intended to restrict the existing means of prosecuting fraudulent credit card schemes, or that Congress believed that the existing federal mail fraud statute did not cover credit card fraud. Presented with this same contention in Maze, the Supreme Court found it unnecessary in its disposition to determine section 1644's significance. It did suggest, however, as we have mentioned that the language of the mail fraud statute is sufficient to encompass credit card frauds where the statute's requirments are met.

■ The sparse legislative history of section 1644 provides no indication that the amendment was intended to be the sole vehicle for prosecution of credit card frauds. It appears to us that section 1644 was intended to ensure and expand the Government's capacity to deal with fraudulent credit card schemes; and we can find no intimation that Congress intended to restrict the use of existing prosecutorial tools or that it believed that a new tool was being created. It is significant in this respect that although the two statutes overlap, they do

8. The section provides in full:
   § 1644. Fraudulent use of credit card
   Whoever, in a transaction affecting interstate or foreign commerce, uses any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain goods or services, or both, having a retail value aggregating $5,000 or more, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

not proscribe identical conduct. Section 1644 specifically prohibits the unauthorized use of a credit card itself and is limited to frauds involving the use of such cards. Section 1341, however, does not punish any particular type of fraudulent scheme; rather, it punishes the use of the mails in furtherance of a wide range of fraudulent schemes. The former statute, moreover, embraces only transactions "affecting interstate or foreign commerce," while the latter is restricted to transactions in which the mails are used. Not all uses of the mails are in interstate or foreign commerce,[9] and not all transactions affecting such commerce involve use of the mails.

It is true, of course, that when the mails are used in the execution of a scheme to defraud that involves the unauthorized use of a credit card to the extent of $5,000, such conduct may violate both section 1341 and section 1644. But it is well established that a single act may violate more than one law. United States v. Beacon Brass Co., 344 U.S. 43, 45, 73 S.Ct. 77, 79, 97 L.Ed. 61 (1952). We cannot conclude that because of the existence of section 1644 the prosecution of credit card frauds under the mail fraud statute is forbidden. Where statutes overlap without conflicting, as in the situation presented here, the earlier statute is not necessarily repealed by the more specific or more recent law. Edwards v. United States, 312 U.S. 473, 483–484, 61 S.Ct. 669, 675, 85 L.Ed. 957 (1941); United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). Thus, though the two

statutes to some extent overlap, the mail fraud statute, as it applies to credit card schemes that make use of the mails, was not impliedly repealed by section 1644. Both should be given their full effect, for such repeals by implication are not favored. *See* United States v. Borden Co., *supra,* at 198–199, 60 S.Ct. at 188.

Edwards v. United States, *supra,* presented a question analogous to that before us. In that case, the several counts of the indictment charged the defendant with violating both the federal mail fraud statute [10] and the anti-fraud provisions of the Securities Act of 1933 in the sale of fraudulent interests in oil and gas leases. The Supreme Court unanimously held valid the counts under both statutes. With respect to the mail fraud counts, the Court explained:

> Petitioner's objection to these counts is that a later act, the Securities Act of 1933, makes it unlawful to use the mails to defraud by the sale of securities. His argument is that in so far as the later act prohibits the fraudulent sale of securities by mail, it repeals by implication the provisions of the old mail fraud statute in so far as they cover securities. We see no basis for a conclusion that Congress intended to repeal the earlier statute. The two can exist and be useful, side by side.

312 U.S. at 483–484, 61 S.Ct. at 675.[11] Similarly, since section 1644 does not purport to be the exclusive vehicle for the federal prosecution of fraudulent credit card schemes, the existence of that section presents no bar to the pros-

---

9. In this case, for example, the acts involved in counts 1, 2 and 5, though they involve mailings, do not necessarily affect interstate or foreign commerce.

10. Formerly, 18 U.S.C. § 338 (1940).

11. In fact, the two have existed and been useful side by side:

> Prior to the passage of the [Securities Act of 1933], most criminal prosecutions for fraudulent securities transactions were brought under the Federal Mail Fraud Statute. Even after the enactment of the various federal securities laws, indictments

have not been limited to securities law crimes. Thus defendants are often additionally charged with mail fraud . . . . Mathews, Criminal Prosecutions Under the Federal Securities Laws and Related Statutes: The Nature and Development of SEC Criminal Cases, 39 Geo.Wash.L.Rev. 901, 911 (1971) (footnotes omitted).

For examples of cases involving criminal prosecutions for securities fraud that have charged federal mail fraud in addition to securities laws crimes, see cases collected *id.* at 911–912 n. 68, as well as United States v. Bruce, 5 Cir., 1973, 488 F.2d 1224.

ecution of appellants in this case pursuant to section 1341.

■ Appellants' second contention is that the evidence is not sufficient to support each of their convictions for the violations of section 1341 charged in the remaining six counts of the indictment in this case.[12] Our role in examining this contention is not to weigh the evidence presented in the trial court or to judge the credibility of witnesses. Rather, viewing the evidence in the light most favorable to the Government, we are to determine whether the jury's verdict is supported by substantial evidence. If it is, it must be sustained. *E. g.*, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Bass, 5 Cir., 1974, 490 F.2d 846, 855; United States v. Blanchette, 5 Cir., 1972, 453 F.2d 859, 860, cert. denied, 406 U.S. 959, 92 S.Ct. 2067, 32 L.Ed.2d 346.

Having carefully reviewed the record in this case, we think it clear that there was more than ample evidence to support appellant Payne's conviction. *See* our discussion, pages 822–823 *supra*. The challenge to the sufficiency of the evidence below is pressed more strenuously, however, with respect to appellant Green. Examination of the evidence presented at trial, though, leaves us with no doubt as to its sufficiency to support her conviction by the jury also as a principal in the credit card scheme. *See* United States v. Bruce, 5 Cir., 1973, 488 F.2d 1224, 1229.[13] We outline briefly here her specific role in the overall scheme.

The record documents that appellant Rita Carpenter Green amassed fraudulent charges of at least $35,738 on 442 separate invoices, using all types of credit cards involved in the scheme. Thus, she personally accounted for more than 26 per cent of the more than $135,000 in fraudulent charges made by appellants in the course of their scheme. These charges were made throughout the two-year period for which the fraudulent charges were shown. In addition, the numerous credit card applications submitted by appellants to secure the cards usually showed Rita, Rita K., or Rita Kay, as the wife of appellant Payne, and in most instances two cards were sought.[14] The record further demonstrates that the trial court fully and properly instructed the jury concerning the legal concepts of principals as well as of aiders and abettors. Looking, therefore, to both the evidence presented and the court's instructions, we can discern no error in the jury's finding that appellant Green was also guilty as a principal of the offenses charged against her in the indictment in this case.

■ Three other contentions are raised by appellants, but only one has been briefed for our consideration. Appellants have briefed their contention that the trial court should have granted appellant Green's motion for severance. It is argued that appellant Green was prejudiced by the joinder of her trial with that of appellant Payne because the transactions described by the Government's witnesses had nothing to do with appellant Green.

Rule 14 of the Federal Rules of Criminal Procedure provides that separate trials may be granted if it can be shown that prejudice would result from joinder of the defendants in a single trial.[15]

---

12. Having determined the convictions on counts 7, 8 and 9 to be invalid, we treat here only counts 1 through 6.

13. Though it is not necessary that the things caused to be mailed be false or fraudulent in themselves, *see* page 824 *supra*, we note that the credit card applications mailed by appellants consistently contained several types of misrepresentations, including those as to occupation, income, length of employment, home address, and surname.

14. That the applications were submitted in the name or alias of appellant Payne, in accordance with general business practice, does not indicate that only he was involved in the fraudulent scheme.

15. Rule 14 provides:
Relief from Prejudicial Joinder
If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial

Since the existence of prejudice depends largely on the facts and circumstances of each case, *e. g.,* United States v. Bryant, 5 Cir., 1974, 490 F.2d 1372, 1379; United States v. Pacheco, 5 Cir., 1974, 489 F.2d 554, 560–561, the grant or denial of a motion for severance is a matter addressed to the discretion of the trial court, Tillman v. United States, 5 Cir., 1969, 406 F.2d 930, 934, vacated as to one defendant on other grounds, cert. denied as to other defendants, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742; Smith v. United States, 5 Cir., 1967, 385 F.2d 34, 37–38. Demonstrating prejudice is a difficult burden, and the trial court's decision will rarely be disturbed on appeal unless abuse of discretion is affirmatively shown. *E. g.,* Tillman v. United States, *supra,* at 934–935; United States v. Blanchette, *supra*; United States v. Bullock, 5 Cir., 1971, 451 F.2d 884, 889; Smith v. United States, *supra.* "The defendant must show something more than the fact that "a separate trial might offer him a better chance of acquittal.' " *E. g.,* Tillman v. United States, *supra,* at 935, and cases cited therein. Having examined appellants' allegations of prejudice in light of the record before us, we find that they present nothing more than a claim that separate trials might have allowed appellant Green a slightly greater opportunity for acquittal. The evidence presented at the trial showed their joint role in the fraudulent scheme, and it is not a valid assertion that a lack of participation on her part resulted in her being prejudiced by the proof of appellant Payne's role. The district court's denial of appellant Green's motion for severance was not an abuse of discretion. *See, e. g.,* United States v. Pacheco, *supra.*

The first of the two remaining issues raised by appellants is whether the instructions to the jury were sufficient to ensure a fair trial for appellant Green. Neither appellant, however, made a timely objection to the charge given to the jury, as required by Rule 30 of the Federal Rules of Criminal Procedure;[16] nor is any error specified on appeal. This being the case, we need not comment upon the instructions given other than to say that viewing the jury charge as a whole, as we must, *e. g.,* United States v. Wilkinson, 5 Cir., 1972, 460 F.2d 725, 732 and cases cited therein, it was full, adequate, and without plain error. *See, e. g.,* Singer v. United States, 380 U.S. 24, 38, 85 S.Ct. 783, 791, 13 L.Ed.2d 630 (1965); United States v. Harris, 5 Cir., 1972, 458 F.2d 670, 678, cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972); Fowler v. United States, 5 Cir., 1957, 242 F.2d 860, 863.

The final issue raised by appellants is "[w]hether it is lawful for the Government to prosecute [appellants] in this case where the evidence, in the most favorable light to the Government, shows and emphasizes the extent to which the issuers of credit cards allow themselves to be victimized even when the credit cards are used for the very purposes intended; and, moreover, originally obtained in the precise manner in which the issuers prescribe." Apparently, appellants are contending that since the procedures for credit card issuance and use were such that the card issuers left themselves easily susceptible—or, at least, appellants argue they did—to the fraudulent scheme perpetrated here, the Government is estopped from prosecut-

---

together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

16. That Rule provides in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury."

ing appellants for committing fraud. Appellants have offered us no basis for such an unusual contention, and we can find none.

We affirm appellant Payne's and appellant Green's convictions and sentences on counts 1 through 6 of the indictment; the convictions and sentences on counts 7 through 9 are annulled and set aside.

Affirmed in part and reversed in part.