**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Louin Ray BRIGHT and Edward Lee Whitten, Defendants-Appellants.**

No. 78–5184.

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1979.

John B. Farese, Ashland, Miss. (Court-appointed), for Bright.

Robert W. Elliott, Ripley, Miss., for Whitten.

H. M. Ray, U. S. Atty., Thomas W. Dawson, Alfred E. Moreton, III, Asst. U. S. Attys., Oxford, Miss., for plaintiff-appellee.

Before THORNBERRY, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

Edgar Lee Whitten and Louin Ray Bright[1] appeal their convictions for mail fraud under 18 U.S.C. §§ 2[2] and 1341.[3] Both appellants challenge the sufficiency of the evidence and attack the district court's supplemental instructions to the jury; Whitten also contends that the trial judge erred in allowing the Government to conduct prejudicial cross-examination of a character witness. We reject these assertions and affirm the convictions.

## I. The Facts

The convictions of Whitten, a lawyer practicing in DeSoto County, Mississippi, and his uncle Ray Bright, formerly Chief Deputy Sheriff of adjoining Marshall County, stemmed from their indictment on charges of using the mails for the purpose of executing a plan to defraud the estate and beneficiaries of their late cousin, J. B. Bright.[4] J. B. and his wife were involved in an automobile accident on August 19, 1974; Mrs. Bright died the next day and J. B. passed away, at the age of 88, on November 21, 1974. A retired rural mail carrier, J. B. Bright left a gross estate of $1,196,707.20.

J. B. executed a will in 1965, dividing his estate among his wife, his two sisters, Nannie Tidewell and Allie Bright Baker, and Mrs. Baker's children. When Mrs. Tidewell died in 1971, he executed a codicil, redistributing her share among the other beneficiaries. Since J. B.'s wife predeceased him, Allie Baker and her children were the only beneficiaries under the 1965 will surviving at the time of J. B.'s death and in the event of intestacy Mrs. Baker was also her brother's sole heir at law.

Aaron Ford, J. B. Bright's brother-in-law[5] and regular attorney, prepared the 1965 will. J. B. kept the original and a favored nephew, named as a trustee in the will, took a Xerox copy for safekeeping. After J. B.'s death, however, the original 1965 will was never found and on Allie Baker's petition as sole heir Aaron Ford opened an intestate estate, with Howard Ford, Aaron's brother and J. B.'s former partner in a construction business, named as administrator.

On January 3, 1975, appellants Whitten and Ray Bright filed with the Chancery Court of Benton County, Mississippi, a document purporting to be J. B. Bright's will,

---

1. The indictment called Bright "Lorin," but according to his brief on appeal that is incorrect. The Government's brief also refers to him as "Louin."

2. 18 U.S.C. § 2 provides in pertinent part:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

3. Under 18 U.S.C. § 1341,
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. Ray Bright was a third and Whitten a fourth cousin to J. B. Bright.

5. Aaron and Howard Ford are the brothers of J. B. Bright's late wife.

dated April 17, 1973. This alleged will named Ray Bright executor of his cousin J. B.'s estate and Ray chose his nephew Whitten to be the estate's lawyer. Bright and Whitten also filed a petition, signed by them in their respective capacities as executor and attorney for the estate, to probate the will and the document was admitted into probate on January 3. Along with the will and petition appellants submitted to the court a notice to the estate's creditors, as required by state law; the court subsequently sent this notice to the *Southern Advocate*, the local weekly newspaper, which published it in three successive issues.

On January 8, Whitten sent letters through the mail to Aaron Ford, Howard Ford and Allie Baker, informing them that he had found J. B.'s will, that they were named as beneficiaries and that he wished to discuss the matter with them in person. Appellants Whitten and Bright visited the Ford brothers and Mrs. Baker on January 9 and 10. The Fords agreed, in light of the newly discovered will, to terminate the administration of the intestate estate and to stand aside in deference to Ray Bright as executor. However, when appellants first showed Mrs. Baker and her daughter and son-in-law, Allene and William Wiley, a copy of the will, they immediately became suspicious as to its authenticity. They questioned the genuineness of J. B.'s signature, wondered why Mrs. Baker's brother had named as executor a distant cousin with whom he had not been close and observed that the document referred to Mrs. Baker as "Alice" rather than Allie, the name by which she was known to her brother J. B. Acting upon these suspicions, Mrs. Baker employed counsel and contested the will in Chancery Court. She later agreed to pay $125,000 to settle this contest, "because at my age I didn't feel like I could go through court for eight or ten years," and the court entered a decree setting aside the 1973 will and admitting to probate the 1965 will. The decree noted that the 1973 document filed by appellants "was not attested

by two or more witnesses as required by statute and is, therefore, no will."

On December 9, 1977, a grand jury indicted appellants Whitten and Bright on six counts of mail fraud, in violation of 18 U.S.C. §§ 2 and 1341. Each count set forth the same five-part scheme to defraud J. B. Bright's estate and its beneficiaries, alleging: that appellants "did prepare and caused to be prepared and filed" a forged will; that they "were resulting beneficiaries under the fraudulent will"; that Ray Bright "would and did serve as executor" of his late cousin's estate; that Bright, "in addition to receipt of an executor's fee . . . would and did unlawfully and fraudulently convert to his own use" more than $81,000 worth of the estate's assets; and that Bright "would and did hire" Whitten as attorney for the estate. Each count then specified a separate mailing caused by appellants "for the purpose of executing the aforesaid scheme and artifice to defraud." Counts I through III described the three letters that Whitten sent to the Ford brothers and Mrs. Baker and Counts IV through VI enumerated the three issues of the *Southern Advocate*, containing the notice to creditors that appellants filed with the Chancery Court, which were mailed to the paper's subscribers.

At trial, appellants contended that J. B. Bright came to Whitten's office on April 17, 1973, and executed a will. According to appellants, J. B. returned to Whitten's office on the first Monday in June 1974 to make a new will, with the most important change being inclusion of the Ford brothers as beneficiaries.[6] Because this was a busy day at court, Whitten wrote the changes in longhand on the original will and gave it to his secretary, instructing her to type the new will on the personal typewriter he kept in his office. Whitten testified that he then left for court, without seeing the typed version of the revised will or observing its execution. During his testimony, Whitten also stated that his secretary failed to

---

**6.** Whitten's secretary, Mrs. C. V. Green, and her husband, Boyd, a business partner of Whitten, testified that they had seen J. B. Bright in Whitten's office sometime in the spring or summer of 1974. Boyd Green said that J. B. had told him that he was there to revise his will.

change the date in typing the revised will, thereby accounting for the discrepancy between the date appearing on the document filed with the probate court and the date of its alleged preparation. Ray Bright denied any involvement in the preparation of the will.

Two secretaries in Whitten's office, Mable Hays and Jocile Woolfolk, allegedly witnessed and signed the purported will.[7] However, both women testified that the signatures appearing on the document were not genuine and three handwriting experts agreed that the women's signatures had been forged. In addition, Allie Baker, her son, James Bowen Baker, and her son-in-law, William Wiley, testified that it was not J. B.'s real signature that appeared on the will dated April 17; three expert witnesses concurred in that opinion. Moreover, according to the testimony of an employee of the Southworth Paper Company, which produced the paper on which the will dated April 17, 1973 was typed, that paper was not manufactured until 1974. Finally, Ray Bright admitted on the stand that he had "used" for personal purposes more than $81,000 worth of the estate's assets.

After a two-week trial, the jury convicted Whitten and Ray Bright on all six counts of the indictment. The appellants each received concurrent sentences of three years on each count.

## II. The Sufficiency of the Evidence

■ Appellants Whitten and Bright first challenge the sufficiency of the evidence supporting their convictions, asserting that the district court erred in denying their motions for judgments of acquittal. They contend that the Government failed to show

that they caused the forgery of the will and argue that the mailings specified in the indictment and proved at trial did not constitute use of the mails within the meaning of 18 U.S.C. § 1341. These arguments are without merit. The offense of mail fraud under section 1341 has two essential elements: (1) a scheme to defraud, and (2) the causing of a mailing for the purpose of executing that scheme. *United States v. Crockett*, 5 Cir., 1976, 534 F.2d 589, 593; *United States v. Green*, 5 Cir., 1974, 494 F.2d 820, 823-24, *cert. denied*, 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974). Here, there is ample evidence to support each necessary part of the offense.

### A. The Scheme to Defraud

■ Contrary to appellants' contention, the scheme to defraud set forth in the indictment was not limited to the actual forgery of the will. Forgery was the first step in the scheme, but to ensure the plan's success appellants also had to maneuver themselves into positions of control over the estate's assets and guide the will through probate. Accordingly, the indictment encompassed Ray Bright's selection of Whitten as attorney for the estate and Bright's misappropriation of more than $81,000 of the estate's assets. Bright named Whitten as the estate's lawyer, accompanied him on his visits to the Ford brothers and Mrs. Baker, signed and filed the papers necessary to ensure admission of the forged will into probate and assumed management of the estate's assets. Moreover, he admitted under oath that he had "used" over $81,000 of those assets for personal purposes.[8] Thus, even if we accept Bright's claim that

---

7. On January 3, 1975, Miss Hays and Miss Woolfolk both signed the proof of will, attesting that they had witnessed the document's execution. Whitten visited Woolfolk at her home, showing her either the original or a copy of the will and asking her to sign the proof of will. Woolfolk questioned whether the signature on the will was hers and signed the proof only upon Whitten's assurance that the signature was genuine. Hays also did not remember having witnessed or signed the will; she did not recall seeing the original or a copy of the

will on January 3, but relied on Whitten's assurances in signing the proof.

8. On direct examination, Bright's lawyer asked whether he had "borrowed, used, or whatever we want to term it" "approximately $81,-736.28" of the estate's assets. Bright replied that he had, but added that he never had "any intention of depriving the heirs of that money" and pointed out that he had begun efforts to return it, by repaying $63,000 some odd dollars of it" and signing a note for the balance.

there was "no proof" that he "forged any signatures or knew that any signatures were forged," his participation in the alleged scheme is still clear.

The Government presented overwhelming evidence that the will was forged. The purported witnesses to the will denied having signed it and expert testimony supported their contentions. Handwriting experts also agreed with relatives of J. B. Bright that J. B.'s signature was not genuine. The document, dated April 17, 1973, was typed on paper not manufactured until 1974 and it called the testator's only living sister by an incorrect name. Though Whitten claimed not to have observed the will's execution, he admitted preparing the document and directing his secretary to type it. No one else with access to Whitten's files, where the will was allegedly "found," had any plausible motivation to cause the forgery of the will. In light of the foregoing, we cannot say that "the jury must necessarily have had a reasonable doubt" regarding appellants' perpetration of the scheme to defraud alleged in the indictment. *United States v. Warner*, 5 Cir., 1971, 441 F.2d 821, 825, *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). We conclude that there is sufficient evidence to support this essential element of the mail fraud offense.

### B. Causing a Mailing for the Purpose of Executing the Scheme

Each separate mailing in furtherance of a scheme to defraud constitutes a separate violation of section 1341, *United States v. Crockett, supra*, 534 F.2d at 593. Here, the indictment enumerated six such mailings: the three letters that Whitten sent to the Ford brothers and Allie Baker informing them of the purported will's existence and the three issues of the *Southern Advocate*, containing the notice to the estate's creditors, which were mailed to the newspaper's subscribers.

■ First, Bright asserts that we cannot uphold his convictions under Counts I through III of the indictment, since there was no evidence that he caused the letters to be mailed. However, "it is not necessary that a defendant actually do any of the mailing so long as there is sufficient evidence to tie him to the fraudulent scheme which involves the use of the mails." *Milam v. United States*, 5 Cir., 1963, 322 F.2d 104, 107; *see United States v. Crockett, supra*, 534 F.2d at 593. Second, both appellants contend that the letters were sent after completion of any fraud, but as we have already noted, the fraudulent scheme alleged in the indictment went far beyond the mere forgery of the will. Next, appellants argue that section 1341 does not apply to these mailings because the letters had the effect of alerting the recipients to their rights under the will. The letters were obviously intended, however, to aid appellants in convincing the Fords and Mrs. Baker that a genuine will had been found, thereby easing the documents' course through probate and helping assure appellants' control of the estate's assets. Thus, the letters were "a part of the execution of the fraud," *United States v. Green, supra*, 494 F.2d at 824; *United States v. Crockett, supra*, 534 F.2d at 593, and were therefore within the scope of section 1341.

■ Finally, relying principally on *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), appellants urge that we overturn their convictions under Counts IV through VI of the indictment because Mississippi law required them to file the notice to creditors which appeared in the issues of the *Southern Advocate* that were sent through the mails. In *Parr*, the indictment charged the defendants, officials of a Texas school board, with embezzling tax money collected by the school district. It specified the sending of tax notices and receipt of tax payments as mailings done in furtherance of that fraudulent scheme. The Supreme Court reversed the convictions under section 1341, in part because state law in effect required the defendants to cause the mailings set forth in the indictment. However, appellants ignore the crucial distinction between *Parr* and this case. Under state law, the mailings in *Parr* would have occurred irrespective of the defendants' embezzlement; the school district reg-

ularly used the mails to send tax notices and receive payments. Here, by contrast, Mississippi's requirement of notice to the estate's creditors was triggered by the fraudulent scheme. If Whitten and Ray Bright had not decided to defraud the estate of their late cousin, they would not have had to comply with the state law requiring them to file the creditors' notice.

Under Mississippi law, appellants had to file the creditors' notice to secure admission of the forged will into probate. A person "'causes' the mails to be used" when he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *United States v. Green, supra,* 494 F.2d at 824; *United States v. Crockett, supra,* 534 F.2d at 593. Appellants could have reasonably foreseen that the Chancery Court would follow its normal practice after they filed the notice to creditors, by publishing that notice in the local newspaper which reached most of its subscribers by mail. Since publication of the creditors' notice heightened the false impression that the forged will was valid and thereby increased the chances of successful probate, the mailing of the newspapers was "part of the execution of the fraud" and was therefore covered by the provisions of section 1341.

### III. The Supplemental Jury Instructions

Appellants Whitten and Bright next urge two grounds for reversal arising from the district court's supplemental charge to the jury. The jury began its deliberations at 5:30 p. m. on Thursday, February 23, 1978. The judge recalled the jurors at approximately 10:30 p. m., instructing them to recess for the night and to resume at 9 a. m. Friday. The jury returned the next morning and deliberated until 11:55 a. m., at which time the jury foreman sent the judge a note advising that "[t]he jury feels that they are deadlocked. This has been the

situation since approximately 8 p. m. last night, with no changes in votes. Please give us your instructions." The judge read this message to counsel and explained that, after a lunch break, he intended to recall the jury and "give them further instructions with reference to this matter, in response to their request." When court reconvened at 1:40 p. m., the judge reread the note in the presence of the jurors and ascertained that they had taken another vote since sending the message, without change in the result. He then delivered, over the objection of appellants' counsel, a modified version of the *"Allen"* charge. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The jury retired for further deliberations and returned after one hour and twenty minutes with verdicts of guilty as to both defendants on all counts of the indictment.

■ Appellants first contend that the district judge erred in failing to inform their counsel, after his first reading of the jury foreman's note, that he intended to give a version of the *Allen* charge. However, a trial judge is not required to notify defense counsel of his plan to use such a charge. If a defendant's attorney is present when the instructions are actually read to the jury and is afforded the opportunity to object, that is sufficient. *United States v. Bailey,* 5 Cir., 1972, 468 F.2d 652, aff'd en banc 480 F.2d 518 (1973). Here, appellants' lawyers were present when the supplemental instruction was given and took full advantage of their opportunity to object.

■ Appellants Whitten and Bright also attack the supplemental instruction itself, claiming that it was "coercive" and otherwise constitutionally infirm. This contention is meritless. The trial judge read a version of the *Allen* charge substantially identical to the instruction approved in *United States v. Skinner,* 5 Cir., 1976, 535 F.2d 325, 326 n. 2,[9] *cert. denied,* 429 U.S.

---

**9.** When counsel objected to this instruction, the district judge explained that "[t]he charge

which I have just read to the jury is expressly approved by the Fifth Circuit in *United States*

1048, 97 S.Ct. 756, 50 L.Ed.2d 762, which was in turn derived from the *Allen* charge upheld by this court, sitting en banc, in *United States v. Bailey, supra,* 468 F.2d at 661, *aff'd en banc* 480 F.2d 518. In light of the jury's assertion that it was deadlocked and its request for further instructions, the judge did not abuse his discretion in giving this supplemental charge and its use did not "deprive appellant[s] of a fair trial and a unanimous verdict based on proof beyond a reasonable doubt." *United States v. Skinner, supra,* 535 F.2d at 326.

### IV. The Cross-Examination of the Character Witness

 Finally, appellant Whitten asserts that the trial court abused its discretion in allowing the Government to cross-examine one of his character witnesses regarding Whitten's alleged reprimand by a judge and bar association for unprofessional conduct. The witness, an attorney, testified under direct examination that Whitten had a good general reputation in his community for veracity and integrity and declared that he would believe Whitten under oath. On cross-examination, the Government asked this witness whether he had "heard that Mr. Whitten was reprimanded by Judge Dick Thomas in November of last year for unprofessional conduct?", and the witness replied, "No, sir, I had not." During recross-examination, the Government queried, "But you had not heard that Mr. Whitten had been reprimanded by the Bar Association through Judge Thomas in De-Soto County?" Whitten's character witness responded, "I was not aware of either one of them." The Government then asked, "Well, the State Bar then, the Mississippi State Bar?", and the witness answered, "I was not aware of that, no sir." Whitten's counsel objected to each of these questions and, at the close of trial, moved for a mistrial; the lower court overruled the objections and denied the motion.

Arguing that he was "substantially prejudiced by this type of cross-examination," Whitten contends that the district judge should have invoked his discretionary power under Fed.R.Evid. 403 to stop this line of questioning, since "its probative value [was] substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. We disagree. When a witness has testified in support of the defendant's good character, the trial court may in its discretion allow the Government to attempt to undermine the credibility of that witness on cross-examination "by asking him whether he has heard of prior misconduct of the defendant

*v. Skinner* . . . . I note a verbatim copy of that charge was read to the jury by the court." The judge instructed the jury:

> Under these circumstances I would like to instruct you further as follows in the hopes that it will be helpful to you in your deliberations.
>
> You should endeavor to reach an agreement if at all possible. Some jury sometime will have to decide this case.
>
> The case has been tried out very ably by both sides, and all available evidence has been adduced before you. It seems to me that you ought to make every effort to arrive at a unanimous verdict and to reach a conclusion. Of course, the verdict of the jury must represent the opinion of each individual juror, but it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by comparison of views and by arguments among the jurors themselves.
>
> Each juror should listen with deference to the arguments of the other jurors and with a distrust of his own judgment if he finds the large majority of the jury takes a different view than the view he takes.
>
> No juror should go to the jury room with a blind determination that the verdict should represent his opinion of the case at that moment or that he should close his ears to the argument of other jurors who are equally honest and intelligent as himself.
>
> Accordingly, although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of your fellow jurors, the court instructs you, however, that you should examine the issues submitted with an open mind and with candor and with proper regard and deference to the opinions of each other.
>
> It is your duty to decide the case if you can conscientiously do so.
>
> You should listen to each other's arguments with a disposition to be convinced. If a much larger number favors one side or the other, a dissenting juror should consider whether, in the light of the opinions that are expressed by the other jurors in the jury room, he is not in error in his views.

which is inconsistent with the witness' direct testimony." *United States v. Wells*, 5 Cir., 1976, 525 F.2d 974, 976. However, there are "two important limitations upon judicial discretion in admitting inquiries concerning such prior misconduct: first, a requirement that the prosecution have some good-faith factual basis for the incidents inquired about, and second, a requirement that the incidents inquired about are relevant to the character traits involved at trial." *Id.* at 977. Those requirements are both satisfied here. During a conference in chambers after the defendants rested their case, Whitten's lawyer moved for a mistrial, arguing that "the government offered no evidence whatsoever of this highly prejudicial statement" "about a censure from the DeSoto County Bar, the Mississippi State Bar Association for unethical conduct." The Government replied that it was "prepared to show the basis on which we asked the question, that it is a fact, and that our questions were based on that fact." It said that if Whitten's attorney "will stipulate to the letter of reprimand we will introduce that in the record" and volunteered to "move to reopen and call Mr. Whitten for further cross-examination on the matter" if his counsel "thinks it necessary that we prove it." In our view, the Government's proffer of a letter of reprimand for stipulation and its willingness to reopen the case and attempt to prove the fact of Whitten's reprimand demonstrated the necessary "good-faith factual basis for the incidents inquired about." Those incidents were also "relevant to the character traits involved at trial." The character witness, an attorney, testified to Whitten's good reputation for honesty and integrity and the alleged reprimand for unprofessional conduct was relevant to Whitten's community reputation regarding those traits.

AFFIRMED.