UNITED STATES of America, Plaintiff-Appellee,

v.

Victor F. HILDEBRAND and Kenneth L. Smith, Defendants-Appellants.

No. 73–3959.

United States Court of Appeals, Fifth Circuit.

Jan. 9, 1975.

Rehearing Denied Feb. 6, 1975.

James M. Campbell, J. Russell Hornsby, Orlando, Fla., for defendants-appellants.

Robert V. Williams, Tampa, Fla., (Court-appointed), for Smith.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Claude H. Tison, D. Frank Winkles, Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before RIVES, GEWIN and GOLDBERG, Circuit Judges.

GEWIN, Circuit Judge:

Appellants Hildebrand and Smith were found guilty by a jury and convicted on all twelve counts of an indictment charging them with wire and mail fraud. 18 U.S.C. §§ 2, 1341, and 1343. They received three-year concurrent sentences on each count.

■ They first contend that the evidence adduced at trial is insufficient to support their convictions. An examination of the record, however, belies their claims. Hildebrand and one McDevitt[1] patented the Electro Chef, a commercial cooking unit designed to heat food instantly. The unit consisted of an oven enclosing specially designed containers in which the food was heated. The containers resembled styrofoam cups with two metal strips attached for conducting an electrical current. The inventors claimed the entire unit could be placed on a counter for use in dispensing quick hot meals such as chili, macaroni, and stew.

Hildebrand, McDevitt and Smith embarked upon a business venture to sell franchise rights to the Electro Chef throughout several states in the South. Smith allegedly owned exclusive distribution rights, while Hildebrand and McDevitt were to receive a royalty on each Electro Chef manufactured. In reality, however, Smith issued bogus checks to Hildebrand and McDevitt to evidence his proprietary interest.

As "pitch man" Smith placed advertisements in newspapers from Texas to Georgia seeking "partners" in a "proven distributorship program" with "high profit potential." Smith met with prospective investors in each city, demonstrated the attributes of the Electro Chef, and delivered his "sales pitch." In the course of these meetings Smith claimed wide experience in the quick food business and characterized Hildebrand as an electronics "genius", ensconced in a well-stocked Florida laboratory.

After the demonstrations, investors signed a sales and distribution agreement giving them a share of the Electro Chef franchise within a particular state. They mailed cashier's checks or telegraphed money orders payable to Hildebrand and McDevitt in payment of their franchise rights. After deducting minimal expenses, Hildebrand, McDevitt and Smith split the funds three ways.

Following Smith's instructions, many investors rented and redecorated commercial space to house the deep dish cooking units. Smith's promises notwithstanding, they received no aid in establishing their merchandising operations. When it became apparent ovens and cups were not being shipped as agreed, the investors contacted Hildebrand. He placated them with continual promises to send the needed equipment. He assured them the ovens would gain Underwriters' Laboratories approval. When investors asked whether the cups would meet Food and Drug Administration standards, Hildebrand gave two conflicting responses: either that they would pass muster or that such approval was unnecessary. One disgruntled investor from a Houston, Texas group visited the alleged seat of operations, only to find that Hildebrand's "laboratory" consisted of a work bench in his garage. Another unhappy franchisee watched

---

1. Pursuant to a plea bargain, McDevitt pled guilty to one count of the indictment and agreed to testify for the government. On cross-examination defense counsel explored the circumstances surrounding McDevitt's guilty plea in some detail.

Smith, who had earlier claimed a proficiency at constructing 1800 cups per day, struggle unsuccessfully for some ten minutes to fashion even one appropriately designed container.

In the months following their initial contracts, the investors never received the cups or the ovens. The evidence presented revealed that Hildebrand, McDevitt, and Smith received a total of $20,100 for their efforts, while the victim-investors lost approximately $70,000. The evidence of a fraudulent scheme introduced at trial amply supports their convictions. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Appellants base their second contention on the government's alleged failure to comply with due process standards enunciated in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* compels the prosecution to disclose material evidence favorable to the accused. That principle has been expanded to include evidence useful for impeachment purposes. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Williams v. Dutton, 400 F.2d 797 (5th Cir. 1968), adhered to sub nom., Evans v. Dutton, 441 F.2d 657 (5th Cir. 1971).

On July 30, 1973 defense attorneys and the United States Attorney participated in a pre-trial Omnibus hearing at which they agreed to reciprocal discovery pursuant to Rule 16, Fed.R.Crim.P. The order required disclosure of all the government's documentary evidence by August 6, 1973, with supplementation as relevant evidence came into the government's possession between the time of conference and trial. On August 1 the government delivered thirty documents to the

defense, all the prosecuting attorney had in their files.

More than a month following the Omnibus deadline Smith's counsel interviewed prospective government witnesses who showed him copies of documents they had allegedly given postal inspectors years before. The next Monday defense counsel telephoned the United States Attorney's office demanding production of the additional documents. Government counsel replied, "We're xeroxing them now." The documents government attorneys were reproducing, however, did not emanate from postal inspectors' files. Rather, they were obtained from various witness-investors in the course of the prosecution's interviews with the witnesses on the previous Saturday.[2]

At any rate, defense attorneys were notified on Monday, September 10, that additional documents were available for their inspection. Smith's counsel obtained approximately one hundred new documents on Friday, while Hildebrand's attorney waited until Sunday. The delay from Monday to Friday in the case of Smith and from Monday to Sunday in Hildebrand's case is not attributable to the government in any respect. Trial began the next Monday morning, at which time both appellants filed motions to dismiss the indictment with prejudice due to the government's alleged pre-trial derelictions.

The additional documents consisted of copies of contracts signed by investors in the Electro Chef distribution scheme, as well as some handwritten notes by Smith. The only features distinguishing the second set of contracts from those already in appellants' possession were

**2.** Appellants have based their contentions both at trial and on appeal on the assumption that these documents originated in postal inspectors' files. The record discloses, however, that government attorneys had no knowledge of the additional documents until they were presented by witnesses on Saturday, September 8. Confusion apparently arose over what the prosecuting attorney meant by the phrase "We're xeroxing them now," in his telephone conversation with de-

fense counsel. Opposing parties evidently attached different meanings to the word "them." The United States Attorney presumably referred to documents signed by prospective witness-investors, while Smith's counsel made reference to relevant documents held by postal officials. This "communications breakdown" continued through appeal. We have no reason, however, to doubt the prosecution's continued assurances that the documents came from witnesses.

the names, dates, and states which were written on the contract forms. The substance of the printed franchising agreements was identical in Georgia, Alabama, Louisiana, and Texas. Nonetheless, appellants asserverate that possession of the documents at an earlier date would have enabled them to present a better defense. They also claim the United States Attorney's office should be held responsible for nondisclosure of documents which they claim were held by postal inspectors for a prolonged period preceding trial.

■ We cannot agree with appellants' contention that the government's conduct in the circumstances violated the prescriptions of *Brady*. The United States Attorney's office disgorged all the relevant documents in its possession a week prior to trial. Only the cunctation of defense attorneys prevented earlier digestion of their contents. It is questionable whether documents acquired from witnesses on Saturday could have been made available to the defense earlier than Monday.

The principles of *Brady* do not apply unless the evidence is material to exculpation or impeachment. United States v. Frick, 490 F.2d 666 (5th Cir. 1973); United States v. Davis, 487 F.2d 1249 (5th Cir. 1973). The fact that the new documents mirrored those already in appellants' possession evidences their classically cumulative nature.[3] Smith and Hildebrand were themselves signatories to the original contracts, so disclosure of their terms could not have come as a complete surprise. Moreover, the franchise agreements formed much of the basis for inculpating appellants. We therefore entertain serious doubts that these documents were materially exculpatory. In any event, no prejudice occurred as a result of delay in their production. *See* United States v. James,

495 F.2d 434 (5th Cir. 1974); United States v. Long, 468 F.2d 755 (8th Cir. 1972); United States v. Saitta, 443 F.2d 830 (5th Cir. 1971); Adams v. United States, 347 F.2d 665 (5th Cir. 1965).

■ Nor do we sustain appellants' correlative contention concerning alleged suppression of evidence in post office files. Neither the arguments of appellants nor the record disclose any harmful error from the alleged failure of the prosecution to deliver certain documents which appellants claim must have been in the possession of some unidentified postal inspectors. If such documents existed, they were not used in evidence against the appellants. The record contains not even a scintilla of evidence to suggest deliberate suppression by prosecutorial officials. *See generally* United States v. Hauff, 473 F.2d 1350 (7th Cir. 1973).

It is not claimed that the alleged undisclosed documents differed in any substantial manner from those which the government obtained from the witnesses and proffered to defense counsel a full week before trial. Indeed, the record indicates they were the same form, type and nature of printed contracts which appellants had freely and indiscriminately used throughout their entire operations in several states. Appellants' reliance on United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), and United States v. Deutsch, 475 F.2d 55 (5th Cir. 1973), is thus misplaced. Those cases dealt with evidence crucial to a determination of the guilt or innocence of the accused.[4] Here appellants simply assert that if the documents they assume existed had been presented to them, their memory of events might have been sharpened and quickened. We refuse to reverse their convictions on such a slender conjectural thread.

---

**3.** Counsel for appellants admitted at oral argument that these documents contained nothing new.

**4.** In *Bryant* tape recordings of conversations surrounding the sale of narcotics in a hotel

room were lost by agents of the Bureau of Narcotics and Dangerous Drugs. Noting their critical nature, the Court of Appeals for the District of Columbia remanded for further development of facts surrounding their loss.

Moreover, the evidence of appellants' guilt is clear and overwhelming. Witness after witness delineated in convincing detail the deceptive and devious practices of the appellants. It is difficult to conceive of the possibility that contracts in printed form which might have been in the possession of some postal inspector at an undisclosed location would have benefitted the appellants in the slightest degree.

Appellants raise other grounds for reversal of the trial court's judgment, including various evidentiary rulings, reinstruction of the jury, and surplusage in the indictment. We have reviewed their contentions, and they are without merit.

The judgments of conviction are affirmed.

In *Deutsch* the undisclosed evidence was the personnel file of the prosecution's principal witness, a post office employee. The government's entire case rested upon his testimony. This court remanded for an examination of the personnel file to determine whether it would have afforded useful cross-examination.