**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edward Wray CROCKETT, Jr., Eugene Allen Fisher and Hugh R. Segars, Defendants-Appellants.**

No. 74–3923.

United States Court of Appeals,
Fifth Circuit.

June 28, 1976.
Rehearing Denied Aug. 2, 1976.

Herbert Shafer, Atlanta, Ga., Bernard H. Dempsey, Jr., Orlando, Fla., for Crockett.

H. B. Edwards, III, Valdosta, Ga., for Segars.

John Kent Edwards, Valdosta, Ga. (Court appointed), for Fisher.

Ronald T. Knight, U. S. Atty., C. Nathan Davis, O. Hale Almand, Jr., Asst. U. S. Attys., Macon, Ga., for plaintiff-appellee.

Before BROWN, Chief Judge, GOLD-BERG and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

Defendants Edward Wray Crockett, Jr., Hugh R. Segars, and Eugene Allen Fisher appeal from their convictions for conspiring to violate the mail fraud statute, 18 U.S.C. § 371, and for thirteen counts of violating the mail fraud statute—all in connection with a planned bankruptcy, the intent and effect of which was to defraud the creditors of the bankrupt business. The jury returned guilty verdicts as to all three men on all charges. The trial judge sentenced Edward Crockett to five years imprisonment on each of the fourteen counts, Hugh Segars to two years on each of the fourteen counts, and Eugene Fisher to three years on each of the fourteen counts. All sentences were ordered to run concurrently.

In this appeal, defendants assert numerous errors. Crockett's most substantial assignments of error include: 1) the insufficiency of the evidence to sustain the jury's verdicts, 2) the failure of the prosecution to disclose impeaching evidence, and 3) the wrongful admission of evidence of prior criminal acts. Major contentions raised by counsel for Segars and Fisher include: 1) the failure of the prosecution to disclose impeaching evidence, 2) the failure of the prosecution to provide defendants with certain Jencks Act material, and 3) the admission of testimony protected by the marital privilege for confidential communications. After carefully considering these claims, we have concluded that the convictions as to each of the defendants must be affirmed.

## I. THE "BUST OUT"

The indictments in this case resulted from a grand jury investigation of defendants' scheme, called a "bust out," to bilk a large number of out of state manufacturers and distributors. A bust out begins with the formation by the malefactors of a seemingly legitimate wholesale business. The fledgling business's first goal is to establish a favorable credit rating. This task is accomplished by a number of devices which can include temporarily putting cash into the business in order to create a strong balance sheet, bribing credit rating agencies, and inflating financial statements so as to vastly overstate the business's assets and net worth. Also, bills for the company's initial purchases are promptly paid—thus furthering the deception through enhancement of the company's credit standing. As the business becomes more established, its promoters order considerable amounts of additional merchandise although they have no intention of paying for these goods. A huge inventory, most of it not paid for, is built up. The principals then busy themselves disposing of their purchases at substantial discounts or secreting the unsold portion for later below-cost covert sales. In other words, they "bust out" the business. The company is then petitioned into bankruptcy with the mulcted creditors left to pick over the meatless carcass of an assetless enterprise. The con men, or at least those whose names are legally associated with the bankrupt company, suffer a loss of their credit standing and "good" name. In return, they and their co-conspirators reap handsome monetary benefits for having arranged in advance the demise of a local wholesale outfit.

## II. THE OFFENSES—MAIL FRAUD AND CONSPIRACY

A bust out often violates Federal criminal statutes because of the need to use the United States mails. The mail fraud statute, 18 U.S.C. § 1341, first enacted in 1872, provides

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatev-

er to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The elements of the offense were recently discussed at length by this Court in *United States v. Green*, 5 Cir. 1974, 494 F.2d 820. There Judge Ainsworth said:

The two basic elements of a mail fraud offense are (1) the scheme to defraud, and (2) causing a mailing for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *see United States v. Bruce*, 5 Cir., 1973, 488 F.2d 1224, 1230; *Bass v. United States*, 5 Cir., 1969, 409 F.2d 179, cert. denied, 396 U.S. 863, 90 S.Ct. 138, 24 L.Ed.2d 117. While the mailing must, as the statute requires, be "for the purpose of executing the scheme," *Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944), "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element. *United States v. Young*, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548," *Pereira v. United States, supra*, [347 U.S.] at 8, 74 S.Ct. at 362; *see United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). Indeed, it is sufficient if the mailing that is caused is "a part of the execution of the fraud," *Kann v. United States, supra*, [323 U.S.] at 95, 65 S.Ct. at 151, or is "incident to an essential part of the scheme," *Pereira v. United States, supra*, [347 U.S.] at 8, 74 S.Ct. at 363; *see Parr v. United States, supra*, [363 U.S. 370] at 390, 80 S.Ct. [1171] at 1183, 4 L.Ed.2d 1277. One "causes" the mails to be used when one "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ." *United States v. Kenofskey*, 243 U.S. 440,

37 S.Ct. 438, 61 L.Ed. 836." *Pereira v. United States, supra*, [347 U.S.] at 8, 74 S.Ct. at 363; *see United States v. Maze, supra*, [414 U.S.] at 399, 94 S.Ct. at 648. The things caused to be mailed may be "innocent in themselves" without effecting immunization from the mail fraud statute, as long as the mailing is " 'a step in a plot.' *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706." *Parr v. United States, supra*, [363 U.S.] at 390, 80 S.Ct. at 1183. Intent, in other words, "may make an otherwise innocent act criminal, if it is a step in a plot." *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916).

494 F.2d at 823–24.

A defendant need not do any of the mailing so long as there is sufficient evidence to connect him to the fraudulent scheme involving use of the mails. *Milam v. United States*, 5 Cir. 1963, 322 F.2d 104, 107. Each separate mailing in furtherance of the scheme to defraud constitutes a separate offense. *United States v. Ashdown*, 5 Cir. 1975, 509 F.2d 793, 800; *Milam*, 322 F.2d at 109–10.

The conspiracy statute, 18 U.S.C. § 371, under which all three appellants were convicted, states:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

■ The Government must prove two elements in order to sustain a conspiracy verdict: (1) the existence of an agreement by two or more persons to combine efforts to accomplish an illegal purpose (or to use illegal means to accomplish a legal purpose) and (2) a single overt act by any one of the conspirators in furtherance of the conspiracy. *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128, 132

(1940); *United States v. Fontenot*, 5 Cir. 1973, 483 F.2d 315, 321; *United States v. Warner*, 5 Cir. 1971, 441 F.2d 821, 830. Often the agreement cannot be proved by direct testimony because the plot is nurtured in secrecy. Therefore, the existence of the agreement or common purpose may rest upon inferences drawn from relevant and competent circumstantial evidence, usually the acts and declarations of the conspirators themselves. *Fontenot, supra*; *Warner, supra*. Having established the presence of an illegal conspiracy, the Government need only introduce "slight evidence" to connect an individual defendant to the common scheme. *Fontenot, supra*; *Warner, supra*; *Lopez v. United States*, 5 Cir. 1969, 414 F.2d 909, 911.

### III. THE ACCUSATIONS AND THE DEFENSES

The Government charged that Edward Crockett, Reginald Cochran, Allen Fisher and Hugh Segars, named as defendants, and Stanley Cochran and Helen Moore, the last two named as participants but not as defendants, conspired to and did defraud numerous manufacturers and suppliers of household and automotive goods through the device of a pre-planned bankrupt—the Mid-State Distributing Company [Mid-State] of Bainbridge, Georgia.

Specifically, the prosecution argued that Edward Crockett, Reginald Cochran, and Stanley Cochran, Reginald's son, planned the Mid-State bust out. Although the Government did not claim that Crockett was involved in the daily operations of Mid-State, it did allege that he assisted in the planning stages, provided key personnel and buyers, and promised to put up money and to permit the ostensible Mid-State owner, Hugh Segars, falsely to claim ownership of Crockett's personal assets, including the Eagles Club, in order to help Mid-State build an attractive credit rating. While the full extent of Crockett's remuneration was never clarified, the Government contended that for his labors, Crockett was to receive the privilege of purchasing from Mid-State, at fifty percent of distributors' prices, house-

hold furniture with which he could furnish his apartment house complexes. Reginald Cochran, whose case was severed at the end of the trial and who later pled guilty to the conspiracy count, allegedly helped devise the artifice and was in charge of its operations until he went to prison in late April 1972. Segars, a good friend of Crockett, purportedly served as the operation's front man—that is the formal legal owner of the business—and also assisted in the running of the enterprise. His credit standing, soon purposefully to be ruined, was enhanced by his false claims to the ownership of Crockett's assets. The false Mid-State financial statements were said to have been prepared and mailed by Helen Moore at the direction and command of Reginald Cochran and Hugh Segars. The Government also charged that Segars, Reginald Cochran, and Helen Moore used the mails to request manufacturers' catalogues from which they placed Mid-State's purchase orders. Fisher, who joined the scheme only in March, 1972, was accused of knowingly participating in the illicit plan. Specifically, the prosecution sought to prove that he assisted with the daily operations of Mid-State and with the disposition of much of its merchandise.

Defendant Crockett's basic defense was that he had nothing to do with Mid-State and did not know that it was a bust out. Defendants Segars and Fisher did not deny their connection with Mid-State. Instead, they argued that Mid-State was a legitimate business that failed because of mismanagement.

### IV. THE EVIDENCE

#### A. Stanley Cochran's Testimony

Stanley Cochran was the Government's principal witness. Named as a co-conspirator but not as a defendant, he testified after having been granted immunity. He related how Mid-State "emerged" from two earlier attempts during the preceding year to bust out a company. Later in 1971, Reginald Cochran informed the witness that Edward Crockett had agreed to help with a new bust-out which would be undertaken after the holiday season. Stanley

Cochran then explained to the jury that in February 1972, he met with his father, Reginald Cochran, and with Crockett. At that meeting, the participants discussed setting up the new enterprise. Crockett agreed to: 1) provide a front man who could "stand out in the public eye and furnish the credit references," and 2) put $10,000–$25,000 into an escrow account in a manner so that the front man could use the money for credit purposes without being able to withdraw it.[1]

At a second meeting attended by Reginald Cochran, Stanley Cochran, Edward Crockett, and Hugh Segars and held at Edward Crockett's house, the bust-out was described to Segars in flowery terms.[2] Stanley also stated that he was in attendance when Crockett told Segars that the latter could use the Eagles Club as a credit reference in furtherance of the scheme. Then, in Crockett's absence, Reginald Cochran and Hugh Segars discussed the possibility of bribing Dun and Bradstreet in order to obtain an advantageous credit rating.[3] Stanley Cochran further testified that his father had informed him that in addition to assisting with the credit rating, Crockett had promised to provide protection from legal officials. In return for his services, Crockett would be allowed to purchase Mid-State goods at 50% of the distributors' price. Moreover, the senior Cochran told his son that Hugh Segars would get fifty percent of the Mid-State proceeds.

Continuing, Stanley described how a warehouse was procured, manufacturers' catalogs were obtained, financial statements showing inflated assets were prepared, purchase orders and financial statements were mailed to manufacturers and suppliers, and the goods were sold. He explained that when his father left for prison, Allen Fisher joined the business, taking over Reginald Cochran's managerial duties. When asked whether Fisher understood the true nature of Mid-State's business, Stanley replied that before his father departed Mid-State, the three of them, father, son and Fisher, had a conversation in which Reginald Cochran informed Fisher that Mid-State was a bust-out. Stanley Cochran also told the jury of a later conversation among Fisher, Helen Moore, Segars, and himself in which "[i]t was stated that we had to turn a lot more volume in order to get some of these bills paid so we were not padlocked before we got ready to be padlocked."

On cross-examination, Stanley Cochran freely admitted that he had been convicted of four felonies, that he was testifying under a grant of immunity, and that he felt hostility toward Hugh Segars, Reginald Cochran, and Allen Fisher but not toward Edward Crockett.

## B. Helen Moore's Testimony

Unindicted co-conspirator Helen Moore, who had been Reginald Cochran's wife and Stanley Cochran's stepmother during the Bainbridge activity, also was given immunity from prosecution and subsequently testified as to her knowledge of the defendants' scheme. She stated that Mid-State, where

---

1. In later testimony, Stanley Cochran said that he had learned about the money from his father. No one testified that Crockett actually made the money available for Mid-State's use.

2. Stanley Cochran testified as follows:
   Q. [The prosecutor] What do you mean by that?
   A. [witness Stanley Cochran] Well, he [Segars] was told at that meeting that nothing could happen except the ruination of his credit for a period of time.
   Q. What did Mr. Segars say about that?
   A. He said with the amount of money he was going to get out of it, who would need credit.

   .     .     .     .     .

Q. Now, what was he told?
A. He was told . . . it would just be ultimately built up to a point and pyramided and then it would be busted out and the only thing he would have or would happen, it would be padlocked and forced into bankruptcy.
Q. Was it discussed at this meeting why or how he would be forced into bankruptcy?
A. Yes, sir. He said his creditors would force him into bankruptcy.
Q. How would they do that?
A. Well, none of the bills would be paid.

3. Stanley Cochran testified, however, that this was never done.

she had worked as a secretary, bookkeeper, and sales person, was a bust-out. Although she never personally discussed the bankruptcy plan with Edward Crockett, Reginald Cochran told her that Crockett had agreed to join the business.[4] She testified about defendants Segars' and Fisher's roles at Mid-State, adding that Segars wanted to but never did go to the Sheriff. She talked about her own part in typing up and mailing to the manufacturers and suppliers false financial information. Finally, Helen Moore stated that the total outstanding debt owed by Mid-State for purchases from various manufacturers and suppliers was $242,000.

C. Penny Fennell's Testimony

Penny Fennell, called as a Government witness, had had an affair with defendant Crockett during the Mid-State conspiracy. She testified that she had met Mr. Crockett while living in his Park East Apartments and that he had employed her in one of his businesses. On one occasion Mr. Crockett took her to Mid-State where she picked out some furniture. Although she never saw Crockett pay for the merchandise, she did hear him say "that he was going to have to settle up with Mr. Segars."[5]

Other significant testimony given by Penny Fennell pertaining to Crockett and Mid-State includes the following:

Q. [Prosecutor] Now, after this trip that you made to Bainbridge to Mid-State with Mr. Crockett, did you ever have any conversation with Mr. Crockett concerning Mid-State?

.    .    .    .    .

A. [Penny Fennell] It was very shortly within a day or so after we had gone over there [to Mid-State] and I had asked him

what was his part in this so that he was able to get this, all of this, anything he wanted there so easily, and he said his only part was that he had allowed Shorty [Segars] to use the Eagles name as though he owned it and I asked him what good would that do and he said by him saying that he owned the Eagles, when he went to get this merchandise, the merchants would give it to him, more or less, without any question and I asked him, said, well, Shorty doesn't have any part in the Eagles, because I have never seen him working there or doing anything like that, and he said no, he didn't, but he said that doesn't matter. I own it and if the merchants come to me all I have to do is tell them that he does and that clarifies anything they want to know.

Q. Did Mr. Crockett ever mention anything to you concerning the way Mr. Fisher and Mr. Segars were handling the Mid-State Distributing Company?

A. Yes.

Q. What did he say?

A. He said he didn't think they were doing it in a way that they could make the most money out of it. He said the way they were doing it all the merchandise they were getting, they were selling quickly and getting half the money they could get where if they would have used their heads they could have stored it somewhere and later on have taken it and sold it for half price and really made a lot of money—a lot more money than they were making—whereas they were making good money but not near as much as they would have made.

Penny Fennell testified that Edward Crockett had encouraged a prospective Mid-State customer to purchase goods from Hugh Segars by telling the customer that

4. Helen Moore stated that Reginald Cochran had told her that Crockett promised to introduce Cochran to defendant Segars and to put some money in the bank in return for which Crockett was to be allowed to purchase at half cost furniture with which he could refurbish his apartment houses.

5. When asked if she had ever received any other merchandise from Mid-State, Penny Fen-

nell replied that Mr. Crockett had allowed her go over to his Park East Apartments' storage room where there were a couple of bedroom suites "that he had gotten from Shorty [Segars] and Al [Fisher]" and that "he [Crockett] said . . . he had used in the apartments and [he] told me to . . . pick one out and I could have one, which I did."

he [the customer] could buy certain items from Mid-State "for almost nothing and then everything you sell it for is almost clear profit." Finally, Penny Fennell informed the jurors that Crockett often talked about how he had "bought" various public officials.[6]

## D. Richard Bateman's Testimony

Richard Bateman, a general merchandise wholesaler, testified that he had purchased quantities of goods from Hugh Segars and Al Fisher on at least twelve separate visits to the Mid-State warehouse. According to the witness, it was on one of his early buying trips that the defendants Segars and Fisher got together and decided that he could purchase goods from Mid-State at 35% of the amount which Mid-State had paid the manufacturer.[7] Over a two month period, he paid approximately $33,000 in cash for goods which cost Mid-State $94,-600.

## E. Hugh Segars' Testimony

Hugh Segars testified that Mid-State was a legitimate but poorly managed business.

He did not know the dollar value of the merchandise ordered and failed to account for most of the money received from Mid-State's sales except by saying that he and Allen Fisher had spent it on "wine, women, and song." He could not explain what happened to the remaining Mid-State merchandise or to many of Mid-State's records after he decided to close the business in July 1972 because of its poor financial condition. Segars stated that Ed Crockett "had nothing to do with the operation at all." He admitted that he had had Helen Moore list him on the Mid-State financial statement as the owner of the Eagles Club, which was valued on the statement at $40,000. He explained that he really owned only the Club's equipment and not the Club. When asked further about his interest in the Club and the accuracy of the $40,000 valuation, Segars acknowledged that he had no bill of sale to prove his equipment ownership, that he had received no remuneration or rental from the Club although he had permitted it to use the equipment for an extended period of time, and that he had never claimed depreciation for the equipment on his in-

6. Ms. Fennell also testified as follows:
Q. [Prosecutor] Now, was there ever a time that Mr. Crockett spoke of the people who were supplying merchandise to Mr. Segars and Mr. Fisher? Did he use any name that he called them?
A. [Penny Fennell] The first time we were really talking about it and when he was talking about how he was letting Mr. Segars use the Eagles Club name, I remember his last words were something like they were going to teach the Jews a lesson.
Q. Did he use—did he use the pronoun they or what pronoun did he use?
A. Well, that is what surprised me because it was more or less like Shorty and Mr. Fisher was doing all of this and then he said "we" are going to teach the Jews a lesson and it didn't make a lot of sense. It was as though he was a part of it then.

Q. Was there a time when a letter came in that aroused some comment in . . . [Crockett's] office?
A. One day this letter came in and Betty, the secretary there, she thought it was hysterical and she gave it to Ed Wray, Mr. Crockett's son, and he begun laughing at it and gave it to Mr. Crockett. At any rate, I wondered what in the world was so funny. I wanted to read it and Mr. Crockett gave it to

me and I read it. And, they were making comments about these people didn't know when they were better off in the first place. I read it and the letter apparently Shorty [Segars] had ordered some merchandise and failed to pick it up and they were wanting Mr. Crockett to make Mr. Segars pick this merchandise up and the reason it was so funny was because they were laughing at—

Q. Who was present in the conversation?

A. Mr. Crockett, his son, Ed Wray, and myself and Betty Palmer.

Q. Did they say what they were laughing at?
A. Yes, sir. Said because these merchants, they should have just left well enough alone because as it is they still had their merchandise and if Shorty did pick it up, they would not only not have the merchandise but no money either.

7. When asked how he knew that the price to him was 35% of Mid-State's cost, Bateman explained that before each purchase he was given the original manufacturer's invoice which he checked and added.

come tax returns. Moreover, he affirmed the testimony of a prior witness that the equipment had been seized by the Eagles Club landlord for nonpayment of rent and taxes equaling approximately $2500, and that after the seizure he had made no effort to regain his equipment.

### F. Allen Fisher's Testimony

Allen Fisher testified that he had nothing to do with the planning or management of Mid-State. He acted as a salaried salesman trying to get the best possible price for the company's goods. He described a few of his selling efforts including the disposition of goods at a flea market and an auction. Although admitting that he was often with Edward Crockett, he denied to his knowledge that Crockett had anything to do with the company.

### G. Edward Crockett's Testimony

Edward Crockett took the stand and denied having any involvement in Mid-State. He said that although he often advised the manager of the Eagles Club, he did not own that club. He did, however, admit that he had been convicted of conducting a gambling operation at the Eagles Club and conspiring with the local sheriff to obstruct state law in connection with the Eagles Club gambling activities.

### H. Additional Evidence

Numerous representatives of various manufacturing companies that sold goods to Mid-State testified that Mid-State had made unsolicited requests for catalogues and goods, that in agreeing to sell to Mid-State they had relied on Mid-State's financial statements, which usually came through the mails, and that Mid-State had failed to pay for merchandise ordered and received. In addition, the Government placed into evidence much of the correspondence between the unpaid creditor concerns

and Mid-State as well as bank statements and other financial records of Mid-State. A postal inspector, John Otwell, testified that he had examined copies of Mid-State's bank statements and found that only $10,025.40 in checks were made payable to Mid-State's manufacturing firms or suppliers.[8] Helen Moore had stated that Mid-State owed approximately $242,000 for goods ordered and received.

## V. THE LEGAL ISSUES

### A. Sufficiency of the Evidence

Only appellant Crockett challenges the sufficiency of the evidence supporting his conviction. Under the test set forth by the Supreme Court in *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Id.* at 80, 62 S.Ct. at 469, 86 L.Ed. at 704.

We have no hesitancy in concluding that the evidence presented at trial and recounted above supports the jury's determination. Stanley Cochran testified that Edward Crockett attended a meeting at which Mid-State was organized and at which Crockett agreed to put up a "front man" and place cash in the bank. Crockett was also present when in his home the operation including its illegal purpose was explained to Segars, the front man. Penny Fennell detailed the defendant's admissions to her that he had permitted Hugh Segars to claim ownership of the Eagles Club in order that the latter would have a credit reference for Mid-State merchandise orders. Moreover, if the jurors believed Ms. Fennell's testimony, and under *Glasser* we necessarily assume they did, then one necessarily concludes that Crockett was very well acquainted with Mid-State, knew their pricing policies and that they were mulcting their suppliers, and had even asked poten-

---

8. Otwell also said that the deposit total for the period March 14—March 16 never exceeded $700.00. The March 15 Mid-State financial statement, a prosecution exhibit, showed $25,-000 "Cash on Hand and in Banks."

tial buyers to do business with the company.

Additional evidence harmful to appellant's contentions includes Stanley Cochran's testimony that his father, Reginald, had told him that Crockett had agreed to provide credit and protection from police harassment in return for the right to purchase goods at a substantial discount. Helen Moore said that Reginald Cochran had made similar statements to her.

Appellant notes, seemingly without really objecting, that Helen Moore's statements detailing her conversations with Reginald Cochran were hearsay as to Edward Crockett. The same, of course, could have been said about Stanley Cochran's retelling of his father's recitation of the latter's conversations with Crockett. With respect to the question of hearsay, we observe first that the unobjected to narration by Stanley Cochran and Penny Fennell of conversations involving one of them and the defendant Crockett (i. e. conversations not retold to the witnesses by Reginald Cochran) are admissible as admissions, adopted admissions, or admissions by conduct. *See United States v. Apollo,* 5 Cir. 1973, 476 F.2d 156, 161 (admissions and adopted admissions); *see generally,* McCormick §§ 262, 269, 270. Second, with respect to Reginald Cochran's extrajudicial statements implicating the defendant Crockett, the well established rule in the federal courts is as follows:

> "The declarations of one conspirator made in furtherance of the objects of the conspiracy, and during its existence, are admissible against all members of the conspiracy. *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. But a defendant's connection with a conspiracy can not be established by the extrajudicial declarations of a co-conspirator, made out of the presence of the defendant. There must be proof *aliunde* of the existence of the conspiracy, and of the defendant's connection with it, before such statements become admissible as against a defendant not present when they were made. *Glasser v. United*

> *States,* 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680, 701 . . . ."

*United States v. Apollo,* 476 F.2d at 159–160. The test as to the sufficiency of the proof *aliunde* the hearsay was recently set forth by Judge Simpson in *United States v. Oliva,* 5 Cir. 1974, 497 F.2d 130:

> We define the test as whether the government, by evidence independent of the hearsay declarations of a co-conspirator, has established a prima facie case of the existence of a conspiracy and of the defendant's participation therein, that is whether the other evidence *aliunde* the hearsay would be sufficient to support a finding by the jury that the defendant was himself a conspirator.

*Id.* at 132–33.

Excluding the extrajudicial co-conspirator hearsay, we find substantial other evidence, including Stanley Cochran's and Penny Fennell's testimony of admissions made by appellant Crockett in their presence, that easily satisfies the *Oliva* test. Therefore, testimony of Reginald Cochran's conversations with Helen Moore and Stanley Cochran was properly admitted. We observe further that the able and patient trial judge, although not requested to do so, cautioned the jurors both at the time of introduction of the hearsay and in his final charge that the conspiracy itself and a particular defendant's participation in it had to be established before a co-conspirator's extrajudicial statements made outside the presence of the defendant could be considered as evidence against that defendant. *See Lutwak v. United States,* 344 U.S. 604, 618–619, 73 S.Ct. 481, 490, 97 L.Ed. 593, 604 (1953); *United States v. Jimenez,* 5 Cir. 1974, 496 F.2d 288, 291; *United States v. Apollo,* 476 F.2d at 162–64.

We note also the existence of plentiful evidence, both direct and circumstantial, of the fact that Mid-State, the device for accomplishment of the agreement into which Crockett entered, was intended to be and actually was a scheme to defraud its creditors—a bust-out. The use of the mails to implement the scheme was reasonably

foreseeable. *See United States v. Green*, 494 F.2d at 824.

In addition to alleging that Edward Crockett entered into a conspiracy to violate Federal law, the Government listed twenty-nine overt acts carried out by members of the conspiracy in furtherance of their agreement. Examining both the record and the overt acts set forth in the indictment, we are convinced that substantial evidence supports the Government's contention with respect to most of these acts.

■ Thus, having found sufficient proof under the *Glasser* standard of Crockett's participation in an agreement to accomplish an illegal end and of an overt act by a member of the conspiracy in furtherance of the agreement, we reject appellant's claim that he was entitled to a directed verdict of acquittal on the conspiracy count.

■ With respect to the thirteen substantive counts, the judge correctly instructed the jury that an aider and abettor would be liable as a principal. 18 U.S.C. § 2. *United States v. Simmons*, 5 Cir. 1974, 503 F.2d 831, 837. In *Moore v. United States*, 5 Cir. 1966, 356 F.2d 39, we stated the standard for finding aiding and abetting as follows: "[I]n order for a person to aid and abet another in the commission of a crime, it is necessary that he associate himself with the unlawful venture; that he participate in it with the desire of accomplishment and that he seek to make it succeed by his actions." *Id.* at 43. There is ample evidence from which the jury could have found that by providing personnel, credit references, and buyers for the illicit operation, Edward Crockett aided and abetted the conspiracy to defraud. As such, we decline the invitation to reverse under *Glas-*

ser Crockett's conviction for thirteen counts of mail fraud.[9]

### B.  Impeachment Matters

#### 1.  *The Jencks Act*

All three appellants charge a violation of the Jencks Act, 18 U.S.C. § 3500, which provides that

"[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."

18 U.S.C. § 3500(b). The term "statement" is defined in 18 U.S.C. § 3500(e)(2) as "a transcription . . . of an oral statement made by said witness to an agent of the Government and recorded contemporaneously . . . ." Specifically, appellants assert that notwithstanding the prosecution's averment to the trial court that the Government had no Jencks material relating to Helen Moore, "[t]he record . . . shows that there is an original sworn statement of the witness, Helen Moore Cochran, which was filed June 5, 1974 in the Clerk's Office in the Middle District of Georgia." We have examined the purported Jencks material and find that the mysterious sworn statement is the deposition of Helen Moore and Stanley Cochran taken on June 3, 1974, by the attorneys for defendants Crockett, Segars, and Reginald Cochran.[10]

■ We cannot accept the proposition that the defendants were prejudiced by the failure of the Government to provide them with a copy of a statement previously made to their attorneys by Ms. Moore. Certainly the deposition did not contain material sur-

---

**9.** Because Crockett's sentences on each of the fourteen counts run concurrently with the other thirteen sentences, our affirmance of any one of Crockett's convictions is sufficient to affirm the jury's judgment. *Hirabayashi v. United States*, 320 U.S. 81, 85, 63 S.Ct. 1375, 1378, 87 L.Ed. 1774 (1942); *United States v. Easterly*, 5 Cir. 1971, 444 F.2d 1236, 1240. However, we have chosen to evaluate the evidence with respect to all counts, and, having

found it sufficient, affirm all fourteen convictions.

**10.** Mr. Fisher's attorney, Mr. John Edwards, did not appear at the deposition. We note, however, that a member of his firm, Mr. H. B. Edwards, represented the defendant Segars at the June 3 meeting. On appeal, the two Edwards have filed a single brief on behalf of both clients.

prising or unknown to defense counsel.[11] *Cf. United States v. Hildebrand,* 5 Cir. 1975, 506 F.2d 406. Moreover, the sworn deposition is not a "statement" encompassed within the scope of the Jencks Act since it was not "made . . . to an agent of the Government . . . ." In fact, it borders on the ludicrous to suggest that a deposition in which only defense counsel participated can become the subject matter of the Jencks Act. Appellants' Jencks contention is without merit.

### 2. *Brady*

Appellants argue that the trial court's failure to require Government production of the F.B.I. record of Helen Moore's past criminal activities (the rap sheet) violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where the Supreme Court said:

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . . *Id.* at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

In *Williams v. Dutton,* 5 Cir. 1968, 400 F.2d 797, this Court held that *Brady* can encompass "evidence which is materially favorable to the accused . . . as . . . impeaching evidence." *Id.* at 800.

Appellants state that subsequent to trial, Mr. Crockett's counsel "learned . . . that Mrs. Moore has a substantial criminal record covering a wide variety of crimes in several states. . . ." They contend that had this criminal record been available at trial it might have affected the jury's determination of Helen Moore's credibility and therefore, the verdict.

■ The Fifth Circuit applies a strict standard when evaluating the materiality of asserted *Brady* information. In order to find a constitutional violation, the nondisclosed evidence "must be 'crucial, critical, highly significant. . . .' *Luna v. Beto,* 5 Cir., 1968, 395 F.2d 35, 41 (en banc) (Brown, C. J., concurring, joined by a majority of the Court)." *Calley v. Callaway,* 5 Cir. 1975, 519 F.2d 184, 221. As Judge Ainsworth said in *Calley,*

[W]hen *Brady* is invoked to obtain information not favorable on the issue of guilt or innocence but useful for attacking the credibility of a prosecution witness, the information withheld must have a definite impact on the credibility of an important prosecution witness in order for the nondisclosure to require reversal. *See, e. g., United States v. Tashman,* 5 Cir., 1973, 478 F.2d 129 (nondisclosure of plea bargaining session pertaining to defendant-turned-witness whose testimony was critically important); *Flanagan v. Henderson,* 5 Cir., 1974, 496 F.2d 1274 (withholding of rape prosecutrix's original affidavit charging another person with crime); *United States v. Deutsch,* 5 Cir., 1973, 475 F.2d 55 (failure to turn over to defense personnel file of witness who "was the government's whole case"), *United States v. Hibler,* 9 Cir., 1972, 463 F.2d 455 (nondisclosure of evidence refuting uncorroborated testimony of key accomplice-witness); *Powell v. Wiman,* 5 Cir., 1961, 287 F.2d 275 (nondisclosure of psychological background of key witness); cf. *Evans v. Janing,* 8 Cir., 1973, 489 F.2d 470 (reversal not required where no significant chance undisclosed evidence would have induced reasonable doubt in jurors' minds).

■ We do not believe that appellants come within the just cited rule or cases. Appellants do not tell us which of the criminal acts they assert were committed by Helen Moore resulted in felony or moral turpitude convictions.[12] Only convictions

---

11. That the deposition was in defense counsels' possession and available for their use is indicated by the fact that before this Court Mr. Crockett's attorney on appeal relied on the June 3 deposition in support of his argument on another point. After oral argument, he sent the Court his own copy of the deposition, while at the same time arguing that the Government's failure to produce Helen Moore's statement violated the Jencks Act.

12. No specific criminal convictions are mentioned in appellants' briefs before this Court. In a "memorandum in support of motion for

for such offenses may be utilized to impeach a witness's credibility.[13] *United States v. Dunham Concrete Products*, 5 Cir. 1973, 475 F.2d 1241, 1250; *Peel v. United States*, 5 Cir. 1969, 410 F.2d 1141. We could, of course, remand for an evidentiary hearing and findings as to existence *vel non* of prior convictions for felonies or misdemeanors involving moral turpitude and any prejudice to the defendants from the failure to disclose any such convictions.[14] *Cf. United States v. Rivero*, 5 Cir. 1976, 532 F.2d 450. However, because we are convinced that in the context of this case the rap sheet could not have been material, we dispose of the issue ourselves.

Supporting our decision is the fact that even in the absence of Helen Moore's testimony, most of which was merely cumulative to the testimony of other witnesses, there remains under the *Glasser* standard plentiful evidence to support the jury's verdicts as to each of the three appellants. *See* Section IV *supra.* We have already canvassed the evidence against Edward Crockett, *see* Section V. A. *supra,* and find it substantial even without Helen Moore's testimony. Similarly, when viewed through *Glasser* lens the testimony of witnesses Stanley Cochran, Penny Fennell, and Richard Bateman, the circumstantial evidence, and the testimony of the defendants themselves, give strong support to the jury's guilty verdicts with respect to defendants

Segars and Fisher. Thus, this case does not present a controversy such as the ones in *United States v. Deutsch, supra,* or *Beaudine v. United States*, 5 Cir. 1969, 414 F.2d 397, 400–01, where the Government's case rested on the testimony of a critical witness to whom the potential impeaching material applied.

▇▇ In addition, even assuming *arguendo* that Helen Moore was a key witness and that she had been convicted of numerous crimes as alleged by appellants, we do not think that with respect to the question of Helen Moore's believability the F.B.I. rap sheet would have been "crucial, critical, highly significant," or "have a definite impact on . . . [her] credibility . . . ." *Calley, supra.* Nothing in the rap sheet would have tended to disprove anything said by Helen Moore implicating defendants as was the case in *Flanagan v. Henderson, supra.* Nor would the rap sheet directly and immediately have cast doubt on the witness's truthfulness by demonstrating that at trial she had contradicted an earlier statement as was true in *Powell v. Wiman, supra,* or that she had not testified truthfully.[15] *See, e. g., United States v. Hibler, supra.* Instead, the impeachment evidence here merely would have indicated to the jury that Helen Moore had been involved in criminal activities or had done things in the past which would call into

new trial" presented to the trial court, Crockett's counsel stated, without adducing any evidence, that Helen Moore "has an extensive criminal record for prostitution, bad checks, and bail jumping." The memorandum does not tell us whether or not appellant is claiming that Helen Moore was actually *convicted* for the aforementioned three offenses although Crockett's brief on appeal states that at the time of trial she had not been prosecuted on the alleged bail-jumping charge. *See* Section V.B.3. *infra.* In any event, in view of our conclusions *infra* about the non-essential and principally cumulative nature of Helen Moore's testimony, the specific crimes for which she may have been convicted are not of crucial importance to our decision here.

**13.** The new Federal Rules of Evidence, not applicable to the trial below, permit impeachment by evidence of a crime 1) punishable by death or imprisonment in excess of one year, or 2)

involving dishonesty or false statement, regardless of punishment. F.R.Ev. 609(a).

**14.** The trial judge apparently was not asked to nor did he make an *in camera* inspection of the rap sheet. However, it would be fair to infer that he did not believe that the sheet could have been material. Not only did he deny defendants' request during trial for Government production of the rap sheet, but also he refused to grant a new trial when after trial he was presented with the allegations as to Helen Moore's criminal record discussed in footnote 12 *supra.*

**15.** Neither side asked Ms. Moore whether or not she had any prior convictions. Thus, the rap sheet was not likely to contain information either directly contradicting or disproving any part of her testimony.

question her honesty—that is, it would generally have impeached her character. Whatever impact this might have produced on the credibility of her testimony had already been minimized by the jury's knowledge that Helen Moore had participated in an illegal venture (the Bainbridge bust-out), had been named as co-conspirator in the grand jury's indictment, and was testifying under a grant of immunity. Therefore, we find that the failure to compel disclosure of the rap sheet, if error, at all,[16] was not a material or significantly prejudicial omission, did not violate due process of law, and cannot constitute grounds for reversal.

### 3. *Giglio*

Appellant Crockett contends that the Government's failure to inform the defense of an "important agreement it had with Helen Moore" violated the principles set forth in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. In *Giglio,* the Supreme Court ordered a new trial where the prosecution did not reveal to defense counsel the fact that the only witness directly linking petitioner *Giglio* to the crime testified after having been promised immunity from prosecution. Our case, however, is easily distinguishable from *Giglio.* In *Giglio,* the affidavit of a Government prosecutor admitted the existence of the immunity agreement. Here, Crockett's counsel has no proof of any agreement—only his own speculation. He theorizes, without having presented a shred of evidence either to this Court or to the trial court, that 1) Mrs. Moore was wanted by Florida authorities on bail jumping charges, 2) the prosecution knew of these charges

and therefore 3) "[i]t does not strain logic to infer that the prosecution had either an express or tacit understanding with the witness that it would not assist Florida in obtaining custody of her."

Even assuming *arguendo* that defense counsel had presented incontrovertible evidence of such an agreement, under the particular facts before us we would find that the failure to make full disclosure was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see generally,* C. Wright, *Federal Practice & Procedure: Criminal* § 855 (1969). In support of our conclusion, we note first that the impact on the jury of revealing that the Government's immunity agreement extended to a bail jumping charge would have been minimized by the fact that the jurors already knew that Helen Moore was testifying under immunity from prosecution for one crime—the Bainbridge bust-out. Second, as explained in the *Brady* section, *supra,* Helen Moore was not a critical or even important witness as was true of the individual whose bargain with the Government was not disclosed in *Giglio.* Even if Helen Moore's testimony had been discredited by the revelation of an additional immunity agreement, as seems rather unlikely for the reasons discussed in the previous section, the Government's rather substantial case against these appellants would not have been seriously impaired. For these reasons, the error, if any, was harmless beyond a reasonable doubt, and a new trial is not warranted. *Cf. United States v. Muckenstrum,* 5 Cir. 1975, 515 F.2d 568.

**16.** Although this Circuit does not appear to have established any general rule as to when a "rap" sheet must be disclosed, a number of cases from different courts have, with varying results, considered the matter. *See, e. g., United States v. Conder,* 6 Cir. 1970, 423 F.2d 904; *Hemphill v. United States,* 8 Cir. 1968, 392 F.2d 45; *United States v. Quinn,* 364 F.Supp. 432 (N.D.Ga.1973); *United States v. Houston,* 339 F.Supp. 762 (N.D.Ga.1972); *United States v. Eley,* 335 F.Supp. 353 (N.D.Ga.1972); *United States v. Leichtfuss,* 331 F.Supp. 723 (N.D.Ill. 1971); *United States v. Mahany,* 305 F.Supp.

1205 (N.D.Ill.1969); *United States v. Tanner,* 279 F.Supp. 457 (N.D.Ill.1967); *United States v. Cobb,* 271 F.Supp. 159 (S.D.N.Y.1967); *United States v. Leta,* 60 F.R.D. 127 (M.D.Pa.1973); *United States v. Ahmad,* 53 F.R.D. 186 (M.D. Pa.1971). The Supreme Court's version of the 1975 amendments to Rule 16 of the Federal Rules of Criminal Procedure provided for discovery of the names of Government witnesses and their prior felony convictions. This provision, however, was stricken by the Congress. *See* Wright, *Federal Practice and Procedure: Criminal,* § 254, p. 204 (1975 Supp.).

## C. Marital Privilege

■ Appellants Segars and Fisher, relying on the marital privilege protecting confidential communications between husband and wife, see Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 206 (1951); United States v. Harper, 5 Cir. 1971, 450 F.2d 1032; see generally, C. Wright, Federal Practice & Procedure: Criminal § 406 (1969); McCormick, Evidence §§ 78–86 (2d ed. 1972), attack the admission of Helen Moore's recitation of her prior conversations with Reginald Cochran, her husband at the time of both the bust-out and the conversations.[17] Before permitting Ms. Moore to testify, the trial judge met in chambers with the Government lawyers, Reginald Cochran's attorney, and the witness in order to determine if a marital privilege applied to her prospective testimony, and, if such a privilege was applicable, whether or not to sever defendant Reginald Cochran, the holder of the privilege, from the trial. After the attorneys present and the judge questioned the witness, the Court decided to let Ms. Moore testify and carried the severance motion with the trial. At the close of the Government's case, Judge Elliott granted a severance.[18]

■ We need not resolve the question of the privileged status vel non of the pertinent conversations since only Reginald Cochran, not an appellant here, has standing to appeal the trial court's decision. See generally, Wigmore, Evidence §§ 2196, 2340 (McNaughton Rev. 1961), McCormick, supra § 73. Therefore, the privilege issue is not properly before this Court and cannot avail

these appellants. Moreover, we have already determined that Helen Moore's testimony, even if erroneously admitted, had no materially prejudicial effect on these appellants. See Sections V.B. 1. & 2. supra.

■ Appellants Segars and Fisher also complain about the in-chambers hearing which they did not attend and the existence of which they claim to have had no knowledge until this appeal. We agree that it would have been preferable for the court to have informed all counsel of the closed meeting and to have given them an opportunity to attend. However, after carefully scrutinizing the verbatim transcript of the private session, we conclude that the objecting appellants were in no way prejudiced by counsels' absence, and thus their exclusion does not constitute grounds for reversal.

## D. Magnum and Valdosta Salvage

■ Counsel for Crockett contests the prosecution's questioning of Government witness Stanley Cochran about two prior bust-out attempts—Magnum and Valdosta Salvage. We find no error here. The prosecution attempted to link Crockett only to Valdosta Salvage and not to Magnum. With respect to Valdosta Salvage, we think that the testimony about that operation (and Magnum as well) was admissible as evidence detailing the early stages of a single, continuing conspiracy. See McCormick, supra, § 190 at 448–49. Alternatively, even if we accept the appellant's assertion that Magnum and Valdosta Salvage were discrete conspiracies unrelated to the present case, we would still uphold the use

---

**17.** Distinct from the privilege for confidential communications, discussed above, is the rule which permits one of the married couple to object to testimony adverse to him by the other marriage partner even if the spouse's testimony is voluntary and does not involve confidential communications. Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125; see United States v. Harper, 5 Cir. 1971, 450 F.2d 1032, 1045; see generally, 8 Wigmore, Evidence §§ 2227–2245 (McNaughton Rev. 1961); C. Wright, Federal Practice & Procedure: Criminal §§ 405, 406 (1969). Unlike the rule protecting inter-spousal confidential communications, this latter rule, affording protection against adverse spousal testimony becomes un-

available after the dissolution by divorce of the marital union. See Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); see generally, Wright, supra, Wigmore, supra at §§ 2237, 2341. Since Helen Moore and Reginald Cochran were divorced at the time of trial, we need consider only the claim premised on the privilege for confidential communications.

**18.** The trial transcript indicates that the trial judge, refusing to accept the contention that the confidential communications privilege applied to Helen Moore's testimony, severed Reginald Cochran's case from the trial for reasons unrelated to any marital claim.

of this testimony as proof of similar prior acts introduced for the purpose of showing intent. *See United States v. Crockett,* 5 Cir. 1975, 514 F.2d 64, 71–73; *United States v. San Martin,* 5 Cir. 1974, 505 F.2d 918, 921; *Weiss v. United States,* 5 Cir. 1941, 122 F.2d 675, 682.[19] The evidence about Magnum and Valdosta Salvage is plain, clear, and convincing and meets the criteria for admission adumbrated in *United States v. San Martin,* 505 F.2d at 921–922; *United States v. Goodwin,* 5 Cir. 1974, 492 F.2d 1141, 1150. *See generally,* McCormick, *supra,* § 190 at 451–54.

 Crockett's lawyer on appeal asserts that if the Magnum/Valdosta Salvage evidence is viewed as evidence of prior similar acts showing intent, then the court erred in not giving an instruction limiting jury consideration of the prior misconduct to evidence of intent. We note, however, that Crockett's trial counsel, Mr. Shafer, did not request such a limiting instruction, even after the court raised the question of the need for such a charge. Where counsel has been aggressive in his objections throughout the trial (so aggressive that at one point the patient judge, outside the jury's presence, had to caution counsel about attempts to sabotage the trial), we will not recognize on appeal an asserted error which would easily have been cured had there been a proper objection. Furthermore, in the light of the other evidence, the failure to charge did not affect Crockett's substantial rights and therefore does not rise to the level of plain error. *See Sykes v. United States,* 5 Cir. 1966, 373 F.2d 607.

Appellants raise a number of other issues, some of which are related to the questions discussed above. None of these additional contentions has significance or merit.

The clamor for reversal here has required us to laboriously reconstruct from birth to death the life story of a business devised for purposes of fraud and wrongful profits. Appellants' claims for reversal are so numerous that they have necessitated our encyclopedic review of the record in order to assure ourselves that the convictions were proper and no wrongs committed in their proof. Having thus busted out the record and read its story of deceit and misrepresentation, we are convinced that the Bainbridge bust-out was illegally conceived and operated and that no alleged testimonial peccadillo can disturb these convictions. Therefore, we affirm the judgment of the district court.

AFFIRMED.

---

**19.** In *Weiss* we said:

The general rule is that evidence of another crime unconnected with the one on trial is inadmissible, but this rule is subject to a number of exceptions, the first of which is that evidence of other offenses by the accused is admissible to show his criminal intent as to the offense charged, where the other offenses are similar to and not too remote from that charged, and where intent is in issue as an element of the offense charged. 122 F.2d at 682.